THE VICE CHANCELLOR:
The first question concerns the rights of defendant's preferred shareholders, as opposed to the rights of a creditor of the corporation, with respect to certain corporate property, which was pledged to secure payment of notes evidencing the indebtedness to the creditor. Complainants charge that unless the creditor's rights be subordinated to the rights of the preferred shareholders, a fraud or injustice will be inflicted upon the latter. Complainants ask to enjoin approval by defendant's stockholders of a proposed contract which would recognize the rights of the creditor as superior. The second question concerns complainants' challenge of the validity of the stockholders' meeting called for December 28, 1943. This is based upon the facts that the corporation declined, continuously after April 29, 1943, to accept for transfer on its books certificates for shares of its capital stock; that its books show no transfers after that date; and that the only persons to whom it sent notices of the meeting were those appearing on its books as stockholders. The bill also asserts complaints relating to loans from, and pledges of property to, certain banks, and relating to an alleged violation of Section 65 of the Delaware Corporation Law, Rev. Code 1935, § 2097. These matters were expressly abandoned for the purpose of the present motion and need not be discussed. The facts appear from the bill of complaint and from the affidavits filed.
Defendant is a holding company. It owns all of the stock of an operating subsidiary (called, for convenience, Railroad Company), certain of its bonds, and also securities in other companies. Omitting treasury shares, defendant has outstanding 381,206 shares of cumulative preferred capital stock of $100 par value, and 574,458 shares of common stock of like par value. Each share of each class entitles the holder to one vote. Complainants are the beneficial owners of 3100 shares of preferred stock.
Beginning prior to 1931, Arthur Curtiss James, and certain corporations owned or controlled by him, held substantial blocks of preferred and common stock of defendant. At no time did their holdings exceed 41% of the entire capital stock. Mr. James died in 1941. Without stating the accurate details of the present ownership, it may be assumed, at this stage, that a corporation with which James or his estate had some connection, James Foundation of New York, Inc., has succeeded to the ownership of the shares of defendant's stock formerly owned or controlled by James, and that the James Foundation now holds 26,640 shares of preferred stock (about 7% of the preferred) and 351,390 shares of common stock (about 61% of the common). These holdings represent slightly less than 40% of defendant's entire capital stock.
Complainants allege that James, during his life, "possessed at all times a practical working control of the business and affairs of the defendant and through defendant, of Railroad Company, dictated the selection of personnel and caused the election of the directors and officers of the defendant and of Railroad Company amenable and subservient to him"; that "By means of the control and domination in fact exercised by the said James, both the defendant and Railroad Company, were in fact and in law, mere agencies and instrumentalities of the said James"; that "The capital stock of the defendant now [not] owned and/or controlled by the said *Page 911 
James, has at all times been widely distributed and held and at any stockholders' meeting of defendant, it would have been a practical impossibility, even if all facts had been known and disclosed to stockholders, for James' control of the defendant to have been disturbed or shaken."
Between July 1931 and January 1932, one of James' corporations, Curtiss Southwestern Company, made five loans to defendant aggregating approximately 4½ million dollars, upon notes of defendant and collateral security consisting of bonds issued by Railroad Company and other securities owned by defendant, having a face value of approximately 6½ million dollars. The notes and collateral security have been assigned to James Foundation of New York, Inc. The principal indebtedness together with accrued interest and additional advances of $22,454.64 during 1940, 1941, and 1942 now exceed 6½ million dollars, whereas, the market value of the securities pledged is less than 4½ million dollars.
Complainants ever on information and belief that the original loans to defendant (including those made by banks, which are not now in question) were advanced to defendant at James' solicitation "for the purpose of financing Railroad Company and thereby to salvage the investment of the defendant in Railroad Company and to render valuable James' investment in defendant." Defendant did advance large sums to Railroad Company, and as a result of loans and mutual accounts, the latter is now indebted to defendant in an amount exceeding 8½ million dollars, evidenced by non-negotiable notes. Defendant's president says, in an affidavit filed:
"During the depression years, commencing in 1929, the Railroad Company (all the capital stock of which constituted the principal asset of the defendant corporation) was engaged in an extensive rehabilitation program and in the construction of the Northern California extension of the railroad. This required large sums of money, a substantial part of which it became necessary for the defendant corporation to supply either through direct advances to the Railroad Company or through purchase from the Railroad Company of the latter's First Mortgage Bonds when the same were available under the terms of said mortgage and not readily-marketable to the public. It was primarily for such purposes, as well as to meet other requirements of the Railroad Company that the borrowings were made upon which the indebtedness referred to in the complaint was created. * * *"
In August 1935, Railroad Company filed a petition in a Federal District Court in California for the purpose of effecting a plan of reorganization under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. A plan has been finally approved after an appeal to the United States Supreme Court. Under the plan, all of the capital stock of Railroad Company, as well as its indebtedness to defendant evidenced by the notes referred to above, are found to be without equity or value.
On November 22, 1943, defendant's directors entered into an agreement to become effective upon approval by the stockholders. The agreement is between defendant, the secured creditors of defendant (James Foundation and two banks), and the reorganization committee of Railroad Company. The agreement provides that defendant shall assign to the secured creditors, respectively, all remaining property previously pledged to secure payment of the notes of defendant; that defendant shall release the secured creditors of any claims it may have with respect to collateral heretofore sold by the secured creditors (only the banks have disposed of collateral); that the creditors shall cancel and surrender the notes they hold and release and discharge in full the indebtedness represented by the notes (the market value of collateral held is substantially less than the indebtedness under the notes); that defendant shall cooperate with the reorganization committee in carrying out the plan and making it effective by whatever method the committee may determine, and upon request of the committee, shall assign all of the preferred and common stock of Railroad Company to the committee, or its nominee. Complainants seek to prevent the approval and ratification of this agreement by defendant's stockholders.
Complainants contend that approval of the agreement will result in unfairness and inequity to the preferred stockholders of defendant. They allege that the loans to defendant by James' corporation, Curtiss Southwestern Company, were "in fact and in law, contributions to the capital of the defendant and Railroad Company by the said James, the controlling stockholder of the defendant, as aforesaid." They argue *Page 912 
that instead of loaning directly to Railroad Company, James (through Curtiss Southwestern Company) loaned to defendant, and by securing the loans by other assets of defendant, he stood no chance to lose this additional investment, if Railroad Company's condition should not improve; that the risk of the loan made indirectly to Railroad Company was placed upon defendant's preferred shareholders; that a transfer to the James Foundation, pursuant to the proposed contract, of the securities pledged with it, would take from defendant its only remaining assets of value; and that with respect to these assets, the rights of the James Foundation are no greater than the rights of Curtiss Southwestern Company and should, in equity, be subordinated to the rights of defendant's preferred shareholders.
No facts before me cast any shadow of impropriety upon the loans made by Curtiss Southwestern Company to defendant, or indicate that they should be classified as contributions to capital. From all that appears, money was actually loaned, and the securities taken as collateral were not excessive in amount, bearing in mind the magnitude of the loans. The facts show no reason to conclude that the purpose of the loans was objectionable. Defendant's books at the time disclosed a value of its investment in the stock of Railroad Company in the amount of $75,796,400. Thus, it was not an unusual practice for defendant's property to be invested in this subsidiary. It appears to have been a question of business judgment whether defendant should loan sums to Railroad Company in which it had such a substantial investment. Complainants refer to the investment as valueless. In this, they confuse the findings made in the reorganization proceedings, finally confirmed in 1943, with the state of facts existing in 1931 and 1932. There is no showing that the financial circumstances of Railroad Company were such when the loans were made that defendant's directors were unjustified in making the loans.
Notwithstanding this, complainants contend that their position is sustained by what they call the "Deep Rock theory" as expressed in Taylor v. Standard Gas Electric Co., 306 U.S. 307,618, 59 S.Ct. 543, 83 L.Ed. 669, citing also, Pepper v. Litton,308 U.S. 295, 60 S.Ct. 238, 84 L. Ed. 281; American United Mut. Life Ins. Co. v. City of Avon Park, 311 U.S. 138, 61 S.Ct. 157,85 L.Ed. 91, 136 A.L.R. 860; Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982; Sampsell v. Imperial Paper Color Corporation, 313 U.S. 215, 61 S.Ct. 904,85 L. Ed. 1293; Prudence Realization Corp. v. Geist, 316 U.S. 89,62 S.Ct. 978, 86 L.Ed. 1293.
In the Taylor case, the Supreme Court considered a claim of a parent corporation against its subsidiary for sums advanced, and held that the claim of the parent should be subordinated to the rights of preferred stockholders of the subsidiary. The court found that the parent had complete control of the subsidiary; that the latter was, from the outset, insufficiently capitalized, topheavy with debt, and in parlous financial condition; that the parent so managed the affairs of the subsidiary as always to have a stranglehold upon it; that the subsidiary found itself bankrupt, not only because of enormous sums it owed the parent, but because of abuses in management due to the paramount interests of interlocking officers and directors in preserving the parent's position as a proprietor and creditor; and that there were several aspects in which the parent's management and control operated to the detriment of the subsidiary's financial condition and ability to function.
The differences in the situations presented in the Taylor case and in this case are apparent and substantial. Here the facts by no means justify conclusions that either defendant or Railroad Company was, at the outset, or when the loans were made, insufficiently capitalized, topheavy with debt, or in a parlous financial condition; or that James so managed the affairs of either company as always to have a stranglehold upon it; or that there were any abuses in the management of either company; or that James' management and control operated to the detriment of the financial condition and ability to function of either company. The only pertinent respects in which some similarity may be found between this and the Taylor case lie in the circumstances that a holder of voting control made loans to a corporation, and that after a lapse of time, the corporation was unable to satisfy both the loans and the amounts of the liquidation value of its preferred capital stock. But the instant case presents not even a remote analogy with respect to the additional and *Page 913 
determinative circumstances in the Taylor case, of insufficient capitalization of the borrowing company, and the course of dealings between it and the holder of voting control in which the interests of the latter were continuously fostered to the detriment of the borrowing company. Likewise, the other cases cited do not support complainants' contentions.
Having shown no impropriety in the loans to defendant, or the disposition of the proceeds, and no circumstances of insufficient capitalization or course of conduct indicating abuses in management, it is unimportant whether the lender happened to be the controlling stockholder, or someone having no connection with defendant. I find no basis for the assertion of unfairness, injustice or inequity in the proposed transfer of the pledged assets by defendant to the James Foundation.
Complainants next contend that the proposed meeting of stockholders was not validly called and may not be validly held. On April 29, 1943, defendant's board of directors determined "that as a preliminary to liquidation", certificates for shares of its preferred and common stock "would not be accepted for transfer on the books of the corporation after the close of business on April 29". A notice to this effect was "made public and issued to persons seeking to transfer certificates of stock", and registration of transfers on the books was refused. At the same time, trading in defendant's preferred stock on the New York Stock Exchange was suspended, (the common stock had been delisted in 1939). In the affidavit filed, defendant's president says that "Shortly after the * * * decision of the United States Supreme Court [March 15, 1943] affirming the finding that the defendant's principal asset (the preferred and common stock of the Railroad Company) was without equity or value, the defendant was confronted with a situation which was serious and required immediate action in view of the defendant's financial condition and the effect of said decision on its prospects." The bank serving as registrar of the preferred and common stock gave notice of its resignation, effective May 1, 1943. Defendant's president states that the action of the officers and directors with relation to the termination of registration of stock transfers "was taken as a measure of economy under the stress of circumstances."
In November 1943, a special meeting of stockholders was called for December 28. A notice of the meeting, prepared by order of the board of directors, sets forth that the meeting was called for the purpose of considering and voting upon a resolution approving the directors' agreement above discussed, and of electing directors and transacting such other business as might come before an annual meeting of stockholders. Copies of the notice, dated November 24, were sent to the persons appearing on defendant's list of registered shareholders. Since the corporation had declined to register transfers after April 29, the persons thus notified were the stockholders of record on April 29.
It is plain from the facts that after April 29, some persons did present stock certificates for record transfer and that they were refused. The number and identity of such persons do not appear. Moreover, the announcements, admittedly "made public" by the corporation, of its refusal to register transfers were calculated to deter others from requesting registration on the books. Complainants allege that they acquired their beneficial interests in defendant's preferred stock after April 29; so that during the time they have had such interests, the transfer books have been continuously closed.
The problem here will be approached from the standpoint of notice of the meeting. No provisions of the charter or by-laws concerning notice have been mentioned. However, it is elementary that in the absence of waiver, consent or estoppel, reasonable notice to stockholders entitled to vote is a prerequisite to the validity of a special meeting of stockholders. Toombs v. Citizens' Bank, 281 U.S. 643, 50 S.Ct. 434, 74 L.Ed. 1088; 5 Fletcher Cyc. of Corp. § 2006; 2 Thompson on Corporations § 924; 2 Machen Modern Law of Corporations § 1198; 18 C.J.S., Corporations, § 544, p. 1228. Ordinarily, the requirement of notice is met if the shareholders registered on the corporate books are given some appropriate form of notification.
In this connection, certain provisions of Section 16 and 17 of the Delaware Corporation Law, Rev. Code of Del. (1935) §§ 2048, 2049, should be noted. Section 16 provides that "The shares of stock in every corporation shall be * * * transferable on the books of the corporation in such manner and under such regulations *Page 914 
as the By-laws provide". Section 17 reads in part, thus:
"Unless otherwise provided in the Certificate of Incorporation, each stockholder, shall at every meeting of the stockholders be entitled to one vote in person or by proxy for each share of the capital stock held by such stockholder, * * * and, except where the transfer books of the corporation shall have been closed or a date shall have been fixed as a record date for the determination of its stockholders entitled to vote, as hereinafter provided, no share of stock shall be voted on at any election for directors which shall have been transferred on the books of the corporation within twenty days next preceding such election of directors.
"The board of directors shall have power to close the stock transfer books of the corporation for a period not exceeding fifty days preceding the date of any meeting of stockholders or the date for payment of any dividend or the date for the allotment of rights or the date when any change or conversion or exchange of capital stock shall go into effect or for a period of not exceeding fifty days in connection with obtaining the consent of stockholders for any purpose; provided, however, that in lieu of closing the stock transfer books as aforesaid, the by-laws may fix or authorize the board of directors to fix in advance a date, not exceeding fifty days preceding the date of any meeting of stockholders, * * * as a record date for the determination of the stockholders entitled to notice of, and to vote at, any such meeting and any adjournment thereof, * * * and in such case such stockholders and only such stockholders as shall be stockholders of record on the date so fixed shall be entitled to such notice of, and to vote at, such meeting and any adjournment thereof, * * * notwithstanding any transfer of any stock on the books of the corporation after any such record date fixed as aforesaid."
From these two sections, it follows that a corporation owes a duty to register transfers of shares of its stock, and that the board of directors may properly close the transfer books only for limited purposes and for a limited period. It seems to me that the adequacy of a list of registered shareholders as a circumscription of the persons to be notified must depend upon whether, in a particular case, the provisions of these two statutes have been observed. Defendant's directors did not observe them, for they refused to register transfers, and their refusal was not authorized by the provisions of Section 17.
One of the manifest purposes of Section 17 is to permit and facilitate reasonable methods of notification. The statute gives recognition to the practical necessity of dispensing with notice to persons who attempt to become registered shareholders shortly before a meeting. Thus, if the transfer books are closed (or a "record date" is fixed) pursuant to Section 17, persons presenting stock certificates for transfer within a period preceding a meeting (or registered shareholders who become such within a period preceding a meeting) may be properly excluded from the group of persons to be notified. If either of these devices is employed, the maximum duration of such a period of exclusion is 50 days. It is a reasonable and logical corollary of the statutory provisions that whether or not resort is had to one of these devices, at least no persons should be excluded from the group to be notified who would not have been excluded if either of the devices had in fact been employed. Defendant's use, for the purpose of notification, of the stockholders' list in which the last entry was almost 8 months before the meeting, had the effect of omitting notification to persons who could not have been excluded if defendant had properly employed either of the devices of the statute. Hence, at least these persons were wrongfully denied notice.
The only method of notification attempted, in addition to the sending of notices to persons appearing on the stockholders' list, is described by defendant's president as follows:
"* * * a substantial amount of the stock of the defendant corporation stands of record in the name of brokers or their nominees and deponent verily believes that most, if not all of the bona fide owners of such stock, who are not owners of record, hold stock certificates registered in the name of such brokers or nominees. Many of these brokers, in accordance with the custom under the rules of the New York Stock Exchange requested additional copies of the notice of the special meeting of December 28, 1943, and the other documents mailed therewith to stockholders of record for the purpose of forwarding to their customers and obtaining voting instructions. In each such case the additional *Page 915 
copies requested were furnished by the defendant corporation which also supplied such brokers with the amount requested to cover expenses for forwarding the material to their customers and your deponent verily believes that the customers of such brokers in that manner received notice of said meeting and were in a position to have their stock voted in accordance with their instructions. Proxies for the meeting of December 28, 1943 received from brokers, which invariably covered only a portion of the stock registered in their respective names, would indicate this to be a fact."
By this, it does not seem to me that defendant has demonstrated that supplying brokers with copies of the notice was an adequate or appropriate means of notifying the particular group of shareholders to whom the defendant wrongfully failed to give notice.
Defendant urges that notice to the shareholders of record on April 29 constituted a sufficient notice to the transferees of any of such shareholders who may have disposed of their shares, citing MacCrone v. American Capital Corporation, D.C.Del.,51 F.Supp. 462. The situation in that case was wholly different from the present. There was no question of a violation of Section 16. The corporation did not refuse to register stock transfers, and notices of a meeting were sent to stockholders of record at a proper time for the purposes concerned. Defendant's contention is untenable in that it does not give due effect to the provisions of Sections 16 and 17 above discussed.
The means of notification here were patently insufficient to fulfill the requirement of notice of the meeting. In order to enforce, and to afford adequate protection to, the right to notice of those to whom notice was wrongfully denied, any action of persons assembled pursuant to the notification given should not be accorded the legal significance and consequences which are attendant upon action of stockholders at a meeting validly called and held. Of course, this would not follow if it affirmatively appeared that the persons denied notice had consented to the holding of the meeting, or waived or otherwise given up their right to object. Consequently, at this point in the proceeding, a preliminary injunction to prevent the corporation from recognizing as valid, action taken at any assemblage pursuant to the notice dated November 24, 1943, is a proper and suitable form of relief.
An order accordingly has been advised.
 *Page 1