PABST BREWING COMPANY, a Delaware corporation, and William F. Smith, Jr., Plaintiffs,

v.

Irwin L. JACOBS, Dennis M. Mathisen, Daniel T. Lindsay and Gerald A. Schwalbach, individually and as members of the "Shareholders' Committee to Revitalize Pabst", Defendants.

Irwin L. JACOBS, Rodney P. Burwell, Forrest Fraser, Paul Hallingby, Jr., Allan R. Johnson, Daniel T. Lindsay, Dennis M. Mathisen, Gerald A. Schwalbach, Sam Singer, Francis Tarkenton and Loraine Windham, Counterclaimants Third-Party Plaintiffs,

v.

PABST BREWING COMPANY, Thomas N. McGowen, Jr., William F. Smith, Jr., August U. Pabst, Thomas J. Donnelly, Karl Eller, Ira C. Herbert, Karl F. Hoenecke, William E. Kimberly, Sheldon B. Lubar, Frederick P. Stratton, Jr., and Raymond S. Troubh, Counterclaim Defendants Third-Party Defendants.

Civ. A. No. 82–627.

United States District Court, D. Delaware.

Oct. 13, 1982.

As Amended Oct. 18, 1982.

A. Gilchrist Sparks III and Lawrence A. Hamermesh of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Michael W. Schwartz and Eric M. Roth of Wachtell, Lipton, Rosen & Katz, New York City, and Michael, Best & Friedrich, Milwaukee, Wis., of counsel, for plaintiffs.

R. Franklin Balotti, Allen M. Terrell, Jr., and Jesse A. Finkelstein of Richards, Layton & Finger, Wilmington, Del., and Dennis J. Block, James W. Quinn, Charles J. Ferris, Joseph Allerhand, Yvette Miller and Surie Rudoff of Weil, Gotshal & Manges, New York City, for defendants.

## OPINION

LATCHUM, Chief Judge.

Plaintiffs, Pabst Brewing Company and William F. Smith, Jr., its president, chief executive officer and shareholder (collectively referred to as "Pabst") have brought this action pursuant to 28 U.S.C. §§ 2201–2202 and Rule 57, F.R.Civ.P., seeking a declaratory judgment and also ancillary injunctive relief against the defendants, Irwin L. Jacobs, Dennis M. Mathisen, Daniel T. Lindsay and Gerald A. Schwalbach, individually and as members of the Shareholders' Committee To Revitalize Pabst (collectively referred to as "Revitalization Committee"), from obtaining and using written consents, pursuant to Section 228 of the Delaware Corporation Law, 8 *Del.C.* § 228 ("Section 228"). On the other hand, the Revitalization Committee and others who contend that they are elected directors through the consent process have counterclaimed seeking an order declaring that Pabst's directors were removed and that in their stead a slate of directors nominated by the Revitalization Committee had been elected. By agreement of the parties, the sole matter before the Court is those purely legal issues that are raised in Pabst's third cause of action.

## BACKGROUND FACTS

The Revitalization Committee in a Press Release of August 31, 1982, announced that it had made filings with the Securities and Exchange Commission ("SEC") stating its intention to solicit written consents of Pabst's shareholders pursuant to Section 228(a) for the removal of Pabst's incumbent Board of Directors and for the election of the Revitalization Committee's slate of nominees. The filing indicated that, if elected, the Committee's nominees will use every effort to implement, as soon as practicable, a cash tender offer by Pabst for 4 million shares of Pabst stock at a price of $23 per share. (Docket Item ["D.I."] 1, Ex. A.) The Press Release continued and stated that after the proposed offer is completed the Committee intends to use "every effort to implement a merger to acquire Pabst's remaining shares for cash and/or debentures or equity securities (other than common stock) designed to have a value of at least $21 per share." (*Id.*)

On September 7, 1982, the Revitalization Committee mailed to Pabst's shareholders a "Consent Statement" (D.I. 7, Ex. A), and a "Form of Consent" (D.I. 15A, Ex. B) which solicited the shareholder's consent to the removal of Pabst's incumbent directors and the election of the Committee's slate of nominees. Pabst alleges in the Third Cause of Action that this procedure not only violated Delaware law but also the federal securities law.

## SECTION 228

Section 228 provides in pertinent part that any corporate action required to be taken at any annual or special meeting of shareholders may be taken without a meeting, prior notice or a vote, if consents in writing setting forth the action to be taken in this case were executed by a majority of Pabst's outstanding shares.

■ Pabst first contends that as a matter of Delaware law Section 228 is not applicable, where as in this case, the attempted removal and replacement of the directors is undertaken, in the context of a widely held public corporation, by a group of shareholders who do not hold an absolute majority of the outstanding shares. Pabst argues that the teachings of *Stellini v. Oratorio,* 5 Del.J. Corp.L. 362, 364 (Del.Ch.1979); *Sundlun v. Executive Jet Aviation, Inc.,* 273 A.2d 282,

284 (Del.Ch.1970); and *Everett v. Transnation Development Corp.*, 267 A.2d 627, 629 (Del.Ch.1970) stand for the proposition that Section 228 was intended to be used only in those situations where a single shareholder, or a small group of shareholders controls the corporate machinery to the extent that their consent to a particular action would make its outcome a foregone conclusion. (D.I. 15 at 22.)

Although all the cases cited by Pabst involved either a single shareholder or a small group of shareholders attempting to effectuate corporate action by written consents under Section 228, the Court does not believe they support the broad proposition advanced by Pabst. This is so because the broad language of Section 228 includes all Delaware corporations and does not limit in any way those shareholders or groups of shareholders who may exercise that corporate right. *See e.g. Calumet Industries, Inc. v. MacClure*, 464 F.Supp. 19 (N.D.Ill. 1978); Folk, *Corporate Law Developments-1969*, 56 Va.L.R. 755, 784–85 (1970). Consequently, the Court concludes that Pabst's first contention based on Delaware law to be without merit.

THE CONSENT STATEMENT AND SECTION 213

The Revitalization Committee's Consent Statement informed Pabst shareholders as follows:

> The action of removing incumbent directors and electing new directors as set forth herein is deemed to be taken at the time written unrevoked consents, in the accompanying form, are signed by the holders of record on August 31, 1982 of a majority of the outstanding Shares and such consents or copies thereof, as necessary, are delivered to the Company.
>
> \* \* \* \* \* \*
>
> Any written and unrevoked consents submitted to the Committee shall be deemed to remain in full force and effect until immediately prior to the 1983 Annual Meeting of Shareholders which, according to the By-Laws of the Company, is scheduled to be held on April 12, 1983 or for such shorter period as may be required by applicable law. The Committee is not aware of any statute or judicial decision prescribing such a shorter period.

D.I. 7, Ex. A at 2.

Pabst maintains that these statements are materially false and misleading in violation of Section 14(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78n(a) ("Exchange Act"), and particularly Rule 14a–9, 17 C.F.R. § 240.14a–9 (1982) because the Revitalization Committee misstated the consent procedures set forth in Section 213, of Delaware Corporation Law, 8 *Del.C.* § 213 ("Section 213").

Section 213 generally fixes the date for determining shareholders of record. It provides in relevant part as follows:

> (a) In order that the corporation may determine the stockholders entitled ... to express consent to corporate action in writing without a meeting ..., the board of directors may fix, in advance, a record date, which shall not be more than 60 days nor less than 10 days before the date of such meeting, nor more than 60 days prior to any other action.
>
> (b) If no record date is fixed:
>
> \* \* \* \* \* \*
>
> (2) The record date for determining stockholders entitled to express consent to corporate action in writing without a meeting, when no prior actions of the board of directors is necessary, shall be the day on which the first written consent is expressed.

Pabst, in contending that the Revitalization Committee misstated the Section 213 procedures, specifically notes that the Consent Statement informed the shareholders that the written consents may remain in full force and effect until the next annual meeting of shareholders on April 12, 1983 —a 7½ month period. This, Pabst argues, is patently incorrect because Section 213 provides that they may remain in effect only for a maximum period of sixty days— from August 31 until October 30, 1982.

For the purposes of the present litigation, the parties agree that August 31, 1982 was

established under Section 213(b)(2) as the record date, the day on which the first written consent was expressed. The only question before the Court at this time with respect to Section 213 is whether the corporate action sought to be taken with the Section 228 consents could validly be taken after October 30, 1982, 60 days after the record date.

The Revitalization Committee contends that corporate action may be taken by written consents more than 60 days after the record date because Section 213(b)(2) does not expressly set a time period. It argues that the termination of the consent solicitation occurs not by the shareholder's vote on a specified date, but at the precise moment when the action sought to be accomplished is effected (i.e., when the holders of a majority of the outstanding shares have executed consents). The Committee asserts that termination at this time, whether it occurs 20 days or 225 days after the first consent is executed, is entirely consistent with the legislative concept of the consent procedure because that procedure was designed as an alternative to a shareholder's meeting with its attendant election day procedure.

■ The Court disagrees with this reading because Sections 213(a) and (b) must be construed together. Section 213(a) provides that the board of directors may fix a record date which shall be no more than 60 days or less than 10 days prior to a corporate meeting. Further, it expressly provides for a procedure to determine the shareholders who are entitled to express consent to corporate action without a meeting—the board of directors may fix a record date which shall be no more than 60 days prior to the anticipated corporate action. Section 213(b) merely provides a supplemental provision to the general rule of Section 213(a), viz., if the board of directors does not set a record date, then the record date for taking action by consent will be the day that the first consent is expressed. The clause in Section 213(a) which provides that the record date shall be no "more than 60 days prior to any other ac-

tion" is still applicable to Section 228 consent procedures. This conclusion is supported by the rationale in *Bryan v. Western Pacific Railroad Corp.,* 28 Del.Ch. 13, 35 A.2d 909 (Del.Ch.1944). In *Bryan,* shareholders were challenging the validity of the shareholder's meeting called for December 28, 1943 by the board of directors. The challenge was based on the facts that the corporation had declined continuously after April 29, 1943 to accept for transfer on its books shares of its capital stock; that its books revealed no transfers after the April date; and that the only persons who received notice of the meeting were those who appeared as shareholders on April 29, 1943. The Court held that the defendant directors violated Section 17, the predecessor to Section 213, because the directors only had the power to close the stock transfer books for a period not exceeding 50 days.[1]

Although the *Bryan* facts are distinguishable from those in the case because it was the board of directors who effectively set the record date, the Chancery Court's discussion of the statutory provision is highly relevant to this case. The Court of Chancery noted that the underlying purpose of Section 17 (now Section 213) was to "prevent and facilitate reasonable methods of notification" by recognizing the "practical necessity of dispensing with notice to persons who attempt to become registered shareholders shortly before a meeting." *Id.* 35 A.2d at 914. Thus, by placing a maximum time period, the legislature has balanced the interest of the corporation and its shareholders—that is, to allow the corporation sufficient time to determine the shareholders in order to give effective notice of corporate action and to assure that the shareholders who vote have an interest in the corporation.

These underlying principles are equally applicable when corporate action is attempted by the solicitation of written consents pursuant to Section 228. It is a fundamental principle of corporate law that only the shareholders of a corporation may

1. Section 213 changed the 50 day period to 60  days.

make corporate action decisions. If this Court were to hold that Section 213 did not impose a 60 day time limitation and that corporate action could be taken at any time after the first consent has been expressed, then it is possible that a minority of the shareholders could assume majority control simply because they have owned their shares for a substantial length of time. This interpretation of Section 213 would serve no public interest and frustrate the concept of corporate democracy.

█ Thus, the Court finds that the Revitalization Committee misstated Delaware law when it informed the shareholders that the consents would remain in full force and effect for a 7½ month period. Although the Revitalization Committee also stated that a shorter period may be required by applicable law, this disclaimer does not change the fact that the shareholders were informed that the unrevoked consents would remain effective for 7½ months.

The finding that the Consent Statement included this misleading statement is not sufficient to conclude that the Committee violated Rule 14a–9. The Court must also find that the misstatement was material. In *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), the Supreme Court defined materiality as follows: "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." The purpose of requiring proof of materiality is to ensure that a cause of action cannot be established by a proof of a defect so trivial, or so unrelated to the transaction for which approval is sought, that correction of the defect would not lead to further the interest of the investors protected by Section 14(a). *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

█ Applying these standards, the Court concludes that the Consent Statement is materially misleading with respect to the time in which the consents will be effective. A reasonable shareholder may have given his written consent on the basis of the Committee's statement because he believed that if the consent process were to continue for a 7½ month period, the uncertainties which this procedure would foster would have a detrimental effect upon any potential transaction which the incumbent directors may be contemplating or negotiating. Thus, the Court concludes that the Revitalization Committee has violated Rule 14a–9.

## REVOCATION OF CONSENTS

The Committee's Consent Statement also informed Pabst shareholders with respect to the revocation of consents as follows:

Executed consents may be revoked at any time provided that a written revocation is executed and delivered prior to the time that the action authorized by the executed consents becomes effective, which shall occur when holders of a majority of the outstanding Shares have consented. A revocation may be in any written form provided that it clearly states that the consent is no longer effective. The Committee requests that either the original or photostatic copies of all revocations of consents be sent to the Committee c/o Northwestern National Bank of Minneapolis, N.W. 9860, P.O. Box 1450, Minneapolis, Minnesota 55485 and expressly reserves the right to challenge any revocations not so delivered to the Committee. The Committee urges shareholders who desire to revoke consents to follow the procedures of delivering revocations to the Committee inasmuch as the Committee has been advised that the issue of whether revocations delivered to the Company or to any other person or entity will be legally effective has not been settled under Delaware law.

Pabst contends that Delaware law provides no basis for the proposition that revocations delivered to Pabst may be legally ineffective or that this question involves unsettled law. Pabst maintains that consents, like proxies, may be revoked by sending a signed revocation to the party opposing the solicitation. Moreover, Pabst argues that the purpose and effect of the

Committee's statement regarding irrevocability was to deter shareholders from mailing revocations of consents to Pabst, to impede any planned solicitation of revocations by Pabst and to give the Committee a tactical advantage in the solicitation of consents. (D.I. 1, ¶ 18.) Thus, Pabst contends that the information concerning the revocation of consents was a material misleading statement in violation of Rule 14a–9.

The Revitalization Committee contends that Rule 14a–9 was not violated because the statement concerning revocations is accurate and concerns an unsettled area of law. Before the Court determines whether the Committee violated Rule 14a–9, it must determine whether revocation of Section 228 consents obtained by Pabst would be legally effective.

Judge Decker in *Calumet Industries, Inc. v. MacClure,* 464 F.Supp. 19 (N.D.Ill.1978), considered the issue of revocability of consents under Section 228. In *Calumet,* a dissident shareholder committee mailed consent forms stating that they would be irrevocable. The corporation sued the committee seeking injunctive relief and damages for various alleged violations of the federal securities law, including Rule 14a–9. *Id.* at 26 n. 2. The court held that the consents were revocable and that the statement of irrevocability in the solicitation material constituted a violation of Rule 14a–9.

While *Calumet* did not determine to whom the revocations must be sent, the court did discuss the similarities of consents and proxies insofar as revocability was concerned. Specifically, the court held that consents, as proxies, provide a means whereby shareholders can exercise their votes without the necessity of attending a shareholder's meeting and that both devices enable competing sides to "attempt to garner support for a particular policy or election." *Id.* at 27.

■ Thus, the revocation of consents is governed by the same general principles

applicable to the revocation of proxies. Under Delaware law, a shareholder may revoke his previous proxies by giving the revocation to the party who opposes the initial solicitation. *See e.g. Elgin National Industries, Inc. v. Chemetron Corp.,* 299 F.Supp. 367, 371–72 (D.Del.1969); *Investment Associates, Inc. v. Standard Power & Light Corp.,* 29 Del.Ch. 225, 48 A.2d 501, 513 (Del. Ch.1946), *aff'd,* 29 Del.Ch. 593, 51 A.2d 572 (Del.1947). Consequently, this Court concludes that Section 228 consents may be revoked by sending a signed revocation to a party opposing solicitations.

The Committee contends that the party to whom the revocations are sent is not material for a shareholder's decision to remove the incumbent board members and that this was not a violation of Rule 14a–9. Pabst, of course, argues that the Committee's statement was misleading and material. However, the Court need not resolve this latter issue. Because the Court has now determined that revocations of consents may be sent either to the solicitor of the consents or to the party opposing the consents, it will order the Committee, if it continues to solicit consents in the future, to refrain from informing shareholders that it is unsettled Delaware law whether the delivery of revocation of consents to others will be effective.

FORM OF SHAREHOLDER CONSENT

Pabst also contends that the Committee's Form of Shareholder Consent violates Rule 14a–4(b)(2), 17 C.F.R. § 240.14a–4(b)(2). That rule requires a proxy form that is to be used for the election of ·directors must state the names of the persons nominated and provide a means for shareholders to withhold authority to vote for each nominee.[2] The Rule sets forth four methods of complying with this latter requirement:

> (i) a box opposite the name of each nominee which may be marked to indicate that authority to vote for such nominee is withheld; or

---

**2.** The Proxy rules for the election of directors were made applicable with respect to solicitation of consents and authorizations after February 15, 1968. *See* Securities Exchange Act No.

8206 *reprinted in* [1967–1969 Transfer Binder] Fed.Sec.L.R. (CCH) ¶ 77,507 at 83,030 (Dec. 14, 1967).

(ii) an instruction in bold-face type which indicates that the security holder may withhold authority to vote for any nominee by lining through or otherwise striking out the name of any nominee; or

(iii) designated blank spaces in which the shareholder may enter the names of nominees with respect to whom the shareholder chooses to withhold authority to vote; or

(iv) any other similar means, provided that clear instructions are furnished indicating how the shareholder may withhold authority to vote for any nominee.

The Revitalization Committee's Form of Consent does not provide any means for a Pabst shareholder to express consent for the election of some of the Committee's nominees. (*See* D.I. 15a, Ex. B.) The only alternatives presented are: (1) to consent to the removal of entire incumbent board of directors and the election of the entire slate of Committee nominees; (2) to dissent to the removal of entire incumbent directors and to the election of the Committee's slate; and (3) to abstain from consenting. Pabst thereby argues that the Form of Consent violates Rule 14a–4(b)(2).

The Committee opposes this view and argues that before using the Consent Form, the SEC did not oppose the use of the form and cleared their solicitation material. Specifically, the Committee notes that after the preliminary consent materials had been reviewed by the SEC staff, the staff requested the Committee's views (1) on whether the removal step and the election of a replacement board should be separately set forth or included in a unitary proposal and (2) whether the Consent Form should provide shareholders with a mechanism to withhold votes for any particular nominee in light of Rule 14a–4(b)(2). (D.I. 27, ¶ 3.)

After initial oral conversations between the Committee and the SEC staff on the matter, the Committee wrote a letter to the SEC on August 26, 1982, outlining its views as follows:

The Committee believes that it should be able to present to shareholders a unitary proposal for the substitution of its nominees for the incumbent Board of Directors. To allow shareholders to consent separately to the removal of the present Board, and, then, the election of the Committee's nominees or withhold their consent for the election of a particular Committee nominee might have the serious consequence of confusing shareholders in this particular instance.

First, to allow shareholders to remove incumbent Board members through the consent process without simultaneously choosing their replacements would create a void and possibly leave a public corporation without a functioning Board. Consequently, it seems inappropriate to give shareholders such an option even if a caveat is added to make them aware of the consequences of such actions.

Second, in terms of the withholding of consent to a particular nominee, the Committee believes that such a provision does not make sense in an election contest without an opposing slate. This is not a situation where a particular candidate from another slate could edge out a nominee of another group from whom votes are withheld. Moreover, as a practical matter in our case, assuming the allowance of withholds, if any of the Committee nominees receives the requisite amount of consents, once in office they can appoint their colleagues who fell victim to withholds to fill the vacancies in the Board.

*Id.* ¶ 5.

Thereafter on August 31, 1982, five days after the Committee's views were mailed to the SEC, the SEC communicated with the Committee regarding other aspects of the solicitation materials but made no further mention whether shareholders should have an opportunity to withhold votes for individual nominees of the Committee. (*Id.* ¶ 7.)

The Committee argues that this sequence of events preceding the solicitation of consents demonstrates that the SEC's staff has carefully considered and interpreted its own rules with respect to the form of consent and determined that Rule 14a–4(b)(2)

should not be literally followed in this case. Thus, it maintains that the SEC's position is entitled to judicial deference because it reflects a considered judgment by the staff that the format adopted by the Committee complied with the SEC's rules.

On the other hand, Pabst argues that no deference should be accorded the clearance of the solicitation materials because Rule 14a–9(b), 17 C.F.R. § 240.14a–9(b) provides:

> The fact that a proxy statement, form of proxy or other soliciting material has been filed with or examined by the Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders. No representation contrary to the foregoing shall be made.

Further, Pabst maintains that consistent with this regulation, the SEC's clearance letter to the Committee expressly stated:

> The responsibility for the form and content of the proxy soliciting material rests with the persons making the solicitation. The fact that such material has been filed with or reviewed by the staff of the Commission shall not be deemed a finding by the Commission that such material is accurate and complete or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by securityholders.

(D.I. 27, Ex. B at 2.)

Generally, courts have refused to accord weight to a clearance of proxy materials by the SEC staff. *See e.g. Klastorin v. Roth,* 353 F.2d 182, 183 n.2 (C.A. 2, 1965). A limited exception exists, however, where the precise factual or legal question has been brought to the attention of the SEC prior to the issue of the form, and the SEC has subsequently allowed the form to be sent to the shareholders without modification. In that situation, the SEC's inaction may be accorded some weight. *See Sherman v. Posner,* 266 F.Supp. 871, 874 (S.D.N.Y.1966). *See also General Tire Corp. v. Talley Industries, Inc.,* 403 F.2d 159, 163 (C.A. 2, 1968), *cert. denied,* 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969); *Spielman v. General Host Corp.,* 402 F.Supp. 190, 197 (S.D.N.Y.1975), *aff'd,* 538 F.2d 39 (C.A. 2, 1976); *Abramson v. Nytronecs Inc.,* 312 F.Supp. 519, 526 (S.D.N.Y.1970); *Kauder v. United Board & Carton Corp.,* 199 F.Supp. 420, 423–24 (S.D.N.Y.1961). This limited exception is applicable to this case. The SEC's staff had knowledge of the precise legal question that is before this Court and accordingly, this Court must accord some weight to the Staff's inaction.

This does not mean, however, that this Court is relieved of its obligation to exercise its independent judgment as to whether the Revitalization Committee's Form of Consent complied with Rule 14a–4(b)(2). *See Spielman v. General Host Corp., supra,* 402 F.Supp. at 197.

Rule 14a–4(b)(1) is clear on its face; it generally requires that the form which provides for the selection of directors to specifically set forth the name of the nominees and to provide a means for the shareholders to withhold voting for each nominee if the shareholder so chooses. The purpose of the rule was also clearly expressed by the SEC in the following language:

> In many cases, proxy cards represent the only written communication from shareholders which corporations receive on a regular basis. Where the only matters being voted on at the shareholders' meeting are the election of directors and the election or approval of other persons, such as the outside auditors, the Commission's proxy rules presently permit corporations to furnish a proxy card which provides only a means for shareholders to authorize a vote in favor of the entire slate of nominees which has been proposed.

> \*    \*    \*    \*    \*    \*

> After each proxy season the Commission receives a number of letters from shareholders complaining that, while an issuer's proxy statement provided infor-

mation concerning each nominee for election as a director, thereby providing a basis for the shareholder's voting decision, there was no opportunity to express that decision selectively because the proxy card did not provide any mechanism to vote for or against individual nominees. Under these circumstances, the shareholder was required to write in the margins of the proxy card, draw lines, or use other creative means in order to communicate his opposition to any nominee. Several commentators at the Commission's public hearings suggested that the proxy rules be amended to give shareholders an opportunity to send a message to the board of directors by voting against individual nominees.

Based on the foregoing, the Commission has determined to publish for comment amendments to its requirements as to proxies. Proposed Rule 14a–4(b)(2) would require that a form of proxy relating to the election of directors list the nominees and permit shareholders to vote for or against each nominee, individually, by marking a box or by similar means. However, the proxy card may also furnish a means for shareholders to vote in favor of the entire slate of nominees by marking a single box, rather than by marking boxes for each of the nominees, provided that there is a similar means for the security holder to vote against the entire slate.

Exchange Act Release No. 16104, reprinted in [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 82,176 at 82,180 (August 13, 1979) (footnotes omitted).

The Revitalization Committee recognizes that the purpose of the rule was to permit the shareholder to "split the ticket." It argues, however, that no rational basis exists for applying these policies to a situation in which shareholders are asked to remove the incumbent board and replace it with another slate.

■ The Court disagrees. The policies underlying a proxy contest, where the shareholders must decide on what persons are to serve as directors, are equally applicable to a contest by consents, where the shareholders must make the same decision. Some shareholders may very well desire to replace only some of the incumbent directors and not all of them or to select only some of the Committee's nominees and not all of them. The Form of Consent used by the Committee provides no opportunity to make such a selective choice. The Court, consequently, finds that the Committee's Form of Consent violates the letter and spirit of Rule 14a–4(b)(2).

### THE FIVE DAY RULE

Pabst also asserts that the Revitalization Committee violated Rule 14d–2(b) & (c), 17 C.F.R. § 240.14d–2(b) & (c), which in general requires a bidder, who makes a public announcement through a press release that it intends to commence a tender offer, must do so or withdraw the offer within five days of that announcement. Pabst maintains that the Committee's Press Release [3] on August 31, 1982, was an announcement of a tender offer and that it was neither commenced nor withdrawn within five days resulting in the violation of the Rule.

---

**3.** The Press Release provided in pertinent part:

The Shareholder's Committee to Revitalize Pabst announced that its members have made filings today with the Securities and Exchange Commission stating their intention to solicit written consents of Pabst Brewing Company stockholders pursuant to Section 228(a) of the Delaware General Corporation Law for the removal of Pabst's incumbent Board of Directors and for the election of the Committee's nominees. The consent of a majority of Pabst's outstanding shares will be required for these actions to be taken.

The filings indicated that if elected, the Committee's nominees will use every effort to implement, as soon as practicable, a cash tender offer by Pabst for 4,000,000 shares of Pabst stock at a price of $23 per share. After the proposed issuer tender offer is completed, Mr. Irwin L. Jacobs, the Committee Chairman, and three of his associates, who presently own in the aggregate 13.9% of Pabst's outstanding shares, intend to use every effort to implement a merger to acquire Pabst's remaining shares for cash and/or debentures or equity securities (other than common stock) designed to have a value of at least $21 per share.

D.I. 1, Ex. A.

**1078**

■ The Revitalization Committee contends that the "five day rule" is inapplicable as to them because it is not a bidder. Rule 14d–1(b)(1), 17 C.F.R. § 240.14d–1(b)(1) (1982) defines the term "bidder" as follows:

> The term "bidder" means any person who makes a tender offer or on whose behalf a tender offer is made: *Provided, however,* that the term does not include an issuer which makes a tender offer for securities of any class of which it is the issuer.

It argues that Rule 14d–1(b)(1) excludes a tender offer proposal which may be pursued by Pabst, an issuer, if its nominees become the lawfully elected directors of Pabst.

The Court agrees with the Revitalization Committee that *if* it assumes control of Pabst and *if* it causes Pabst to make a tender offer for its own shares, then it will not be a bidder. The Committee, however, does not have control of Pabst and is not making a tender offer on behalf of Pabst at the present time. The Revitalization Committee thus is not an issuer and does not satisfy the proviso which grants an exception to the general definition of bidder. Therefore, the Court finds that it is a bidder under Rule 14d–1(b)(1).

The Revitalization Committee also argues that it could not have complied with the "five day rule" by commencing a tender offer because it did not have control of the board of directors and therefore was "physically impossible for them to cause Pabst to file and disseminate a tender offer statement to its shareholders or to otherwise commence or complete the proposed tender offer." (D.I. 26 at 70.) It further contends that in making its intentions clear with respect to the consent solicitation, it was doing no more than complying with Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d) (Supp.1980). The Committee thus asserts that a conflict exists between the full disclosure requirements of Section 13(d) and the "five day rule."

The SEC expressed the underlying rationale for the "five day rule":

> Rule 14d–2(b) is intended to prevent public announcements by a bidder of the material terms of its tender offer in advance of the offer's formal commencement. The Commission believes that this practice is detrimental to the interests of investors and results in many of the abuses the Williams Act was enacted to prevent. Such pre-commencement public announcements cause security holders to make investment decisions with respect to a tender offer on the basis of incomplete information and trigger market activity normally attendant to a tender offer, such as arbitrageur activity. Since they constitute the practical commencement of a tender offer, such pre-commencement public announcements cause the contest for control of the subject company to occur prior to the application of the Williams Act and therefore deny security holders the protection which that Act was intended by Congress to provide.

Sec.Exch.Act Rel. No. 34–16384, *reprinted* [1979–1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 82,373 at 82,582–83 (Nov. 29, 1979) (footnotes omitted).

By the adoption of "Five Day Rule," the SEC unquestionably intended to prohibit most tender offer advance announcements because it was convinced that such announcements could be used to manipulate the market.

The SEC, however, was not insensitive to a "bidder's" dilemma caused by the disclosures required by Section 13(d) and the rules and regulations promulgated thereunder.[4] The SEC provided a "safe harbor," specifying the kind of announcement which will not trigger application of the "make or withdraw" requirement of Rule 14d–2(b):

> (d) *Announcements not resulting in commencement.* A public announcement by

4. Section 13(d) in general requires a person owing 5 percent or more of a class of stock of an issuer to provide investors with information regarding any change in ownership and control of the issuer to enable the investors to make informed investment decisions. *See* S.Rep. No. 550, 90th Cong. 1st Sess. 7 (1967); H.R.Rep. No. 1711, 90th Cong. 2d Sess. 8, *reprinted in* [1968] U.S.Code Cong. & Ad.News 2811–12.

a bidder through a press release, newspaper advertisement or public statement which only discloses the information in paragraphs (d)(1) through (d)(3) of this section concerning a tender offer in which the consideration consists solely of cash ... shall not be deemed to constitute the commencement of a tender offer under paragraph (a)(5) of this section.

(1) The identity of the bidder;

(2) The identity of the subject company; and

(3) A statement that the bidder intends to make a tender offer in the future for a class of equity securities of the subject company which statement does not specify the amount of securities of such class to be sought or the consideration to be offered therefor.

■ The Revitalization Committee could have complied with the "safe harbor" provision but chose not to when it included the number of, and the consideration for, the shares it may seek to acquire if it assumes control of Pabst's Board of Directors. The inclusion of the number of shares and the consideration to be paid is purely speculative, as such terms will be determined by the facts and circumstances surrounding Pabst and the market, if and when the tender offer is commenced. Furthermore, the SEC has indicated that predictions with respect to future market values under Rule 14a–9 is misleading because such predictions are too speculative and subject to market manipulation. These same considerations are applicable to the "five day rule." Accordingly, the Court concludes that the Revitalization Committee violated the "five day rule" of Rule 14d–2(b) & (c).

**RELIEF**

■ Because the Court has found and declared that the Revitalization Committee by their consent solicitation has violated at least two provisions of the Exchange Act Rules: Rules 14a–9 and 14d–2(b) & (c), it is necessary to formulate appropriate and reasonable relief. Pabst would have the Court enter an order enjoining the Committee from conducting any further solicitation of

consents until the next annual meeting of Pabst's shareholders scheduled for April 12, 1983, in order to afford a "cooling off" period for the allegedly disruptive tactics of the Committee.

On the other hand, the Committee argues that all injunctive relief should be denied because the federal securities act violations did not cause anyone irreparable harm. It maintains that the ongoing contest for control of Pabst has generated over the past year a steady stream of publicity which has afforded Pabst shareholders with more than sufficient information with which to make an informed decision as to who should be selected for Pabst Board of Directors. Alternatively, the Committee contends that even if the Court finds that any injunctive relief is warranted, it should be strictly limited to requiring the Committee to make only corrective disclosures.

The Court finds that the suggestions for relief by both parties are inappropriate and unreasonable. The seven-month "cooling off" period urged by Pabst is too drastic a remedy because such relief, in addition to correcting the defects, would operate to punish the Committee. Such punishment, in the present circumstances, contravenes the purpose behind the federal securities laws. *See General Aircraft Corp. v. Lampert,* 556 F.2d 90, 97 (C.A. 1, 1977).

The Court does recognize the propriety of requiring corrective disclosures in order to provide the shareholders with relevant and material information for them to make an informed decision. *See Jacobs v. Pabst Brewing Co.,* C.A. No. 82–449, D.I. 20 at 9, (D.Del. July 21, 1982). The Court will thus order that corrective disclosures be made in the event the Committee decides to proceed in its efforts through the solicitation of consents process. The Court also recognizes that sufficient time should be given to shareholders to assure that they have the opportunity to receive all material information to make an informed judgment and to this end, the Court concludes that the shareholders should be given 30 days from the date the new solicitation material, cleared by the SEC, is mailed to the shareholders before

corporate action is taken pursuant to the consent process.

In arriving at this conclusion, the Court is well aware that the earliest date in which corporate action could be taken is later than October 30, 1982, sixty days beyond the record date of August 31, 1982. Thus, if the Committee determines to proceed to accomplish its corporate goal pursuant to Section 228, it will be required to set a new record date in order to comply with Delaware law.

An order will be entered in accordance with this Opinion.