**The GILLETTE COMPANY, Plaintiff,**

**v.**

**RB PARTNERS, et al., Defendants.**

**Civ. A. No. 88–0862–WF.**

United States District Court,
D. Massachusetts.

June 30, 1988.

Hugh R. Whiting, Thomas F. Cullen, Jr., John Newman, Jones, Day, Reavis & Pogue, Cleveland, Ohio, John D. Donovan, Jr., Ropes & Gray, Boston, Mass., for plaintiff.

Richard F. Ziegler, Jonathan Blackman, Cleary, Gottlieb, Steen & Hamilton, New York City, Mark Michelson, Choate, Hall & Stewart, Boston, Mass., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WOLF, District Judge.

THE COURT: This case arises out of a proxy contest for the election of four directors of Gillette. Gillette prevailed in that proxy contest in April of 1988. In connection with the proxy contest, within a week before the election, each side filed charges in this Federal District Court alleging that the other had violated Securities and Exchange Commission Rule 14a–9. The case was initially assigned to my colleague, Judge Zobel.

The parties agreed that after the proxy contest, the case would appropriately be tried in phases. Phase one would be the question of whether Gillette violated Rule 14a–9. It was understood correctly that if Gillette were to prevail on that phase, the remaining issues in the case would be rendered moot.

On July 13, the morning of trial, Judge Zobel realized it would be inappropriate for her to participate in deciding the case, and it was randomly reassigned to this court. I first saw the parties less than three weeks ago. In our initial discussions, the parties agreed to limit the issues and evidence to be tried in phase 1, and in return I undertook to endeavor to decide phase 1 as promptly as possible. We started the trial on June 20th. The trial lasted seven days. In addition to hearing the testimony, I have read voluminous exhibits, deposition transcripts, proposed findings of fact and conclusions of law, briefs, including all of those filed last Friday, July 1st, and many cases cited by the parties.

As I've said previously, the case has been very impressively presented. I have been immersed in it for several weeks. I analyzed it. I can and will render my decision today. I'm doing it orally because that is a more efficient way of communicating this decision. A more polished, formal, written decision would take much longer. There is genuine urgency and it is appropriate to

communicate my decision and the reasons of the decision as soon as possible.

The fact, however, that the decision is being communicated orally should not, in any way, suggest that it has been reached casually. I've analyzed the matter as carefully and completely as I would as if I were writing a written decision. In England it is common to announce all decisions in this way. It is appropriate in this case.

The transcript will eventually provide a record of this decision. I will review the transcript to see whether there have been any errors in communication. I will supplement the transcript, I expect, with footnotes which may cite parts of the record and some of the cases I rely on. It's possible that I will write a memo amplifying some of the points of law discussed. The parties, however, may have the uncorrected draft.

At this point, I would make the April 19th advertisement, which has been in dispute, Exhibit 1 to the record; the April 14th Gillette letter Exhibit 2; and the June 20th Agreed Order Exhibit 3.

To avoid any further suspense regarding this opinion which may take several hours to express, I will tell you that I am persuaded that The Coniston Group has proved that the April 19th ad violates Rule 14a–9. The Coniston Group has not proved its other claims. Therefore, it will be necessary next to consider Gillette's defense of unclean hands, and whether Gillette's complaint must be tried before deciding what relief, if any, to grant to The Coniston Group.

The unclean-hands issue presents a very serious issue. The half a dozen people who ran out of the courtroom, I think, got only half of the message I would hope to communicate in this summary, and hope to explain in this opinion.

The evidence presented so far indicates that the unclean-hands issue is not ripe for resolution yet. But it does indicate that The Coniston Group deliberately failed to comply with Bahamian law in establishing the RB Partnership involved in this case.

As a consequence, that partnership may not be a limited partnership. If that is the case, it appears that The Coniston Group violated the federal securities laws with regard to its original 13D. And if so, I believe that there would probably be a related violation by The Coniston Group of Rule 14a–9.

In addition, although again the issue is not ripe yet for resolution, the evidence suggests that Tito Tettamanti may be one of several controlling persons of the RB Partnership. If that is so, failure to disclose him as one of several controlling persons on The Coniston Group's initial 13D's, or indeed all their 13D's, may also be a violation of federal securities laws.

It's my intention to address the unclean-hands issue, as well as every other issue, with particular care. The Coniston Group's conduct, it appears to me, has created an issue which the April 19 ad addresses in what I have found to be a deliberately false and misleading manner. But that conduct may have been somewhat provoked, if not excused, by The Coniston Group's own possible conduct.

When it comes time to address the remedy phase of this litigation, the Court's paramount concern will be for the shareholders of Gillette. Their concerns, their legitimate interests may differ from the particular interests of both The Coniston Group and the management of Gillette.

As the questions presented by this case are, to a significant extent, mixed questions of fact and law, I'm going to explain at the outset the legal standards that I've applied in reaching the decisions that I am explaining today.

The basic question presented is whether Gillette's conduct in any of the respects alleged violated Securities and Exchange Commission Rule 14a–9.[1] Rule 14a–9 states in pertinent part: "(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the

1. 17 C.F.R. § 240.14a–9 (1987).

light of the circumstances under which it is made, is false or misleading with respect to any material fact or which omits to state any material fact necessary in order to make the statements therein not false or misleading ..."

Part (b) of 14a–9 goes on to say, "The fact that a proxy statement, form of proxy or other soliciting material has been filed with or examined by the Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders. No representation contrary to the foregoing shall be made."

And note (b) to 14a–9, which is germane to this case, states: "Material which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associations, without factual foundation" are among the examples of, depending upon the particular facts and circumstances, what may be misleading within the meaning of Rule 14a–9.

The Supreme Court has stressed the importance of Rule 14a–9 to informed voting by shareholders.[2] It has said that fair corporate suffrage is an important right; that Rule 14a–9 is intended to promote free exercise of voting rights by stockholders; and that Rule 14a–9 is necessary for the protection of shareholders.[3] The court's view is that Rule 14a–9 allows adversaries freedom to define issues as each sees them and to debate the merits of those issues, but this freedom is subject to the limitation that shareholders must not be misled.[4]

Among the legitimate issues in any proxy contest, including this one, is what Judge Friendly in the *General Time* case called "the lustre of the opposition;"[5] that is, the credentials and qualifications of one's adversaries. But this issue too is subject to the requirement that shareholders not be misled.

The burden of proof in establishing a violation of Rule 14a–9 is on the plaintiff, and in this phase The Coniston Group is the plaintiff. In order to prevail, The Coniston Group has had to prove, first, the proxy materials contain a false or misleading statement of material fact or omit to state a material fact necessary to make the statement not false or misleading; and second, the misstatement or omission was the result of knowing, reckless, or negligent conduct.[6] This court interprets "knowing" to be a statement made in bad faith and with knowledge that it was false.[7]

---

**2.** *Gould v. American Hawaiian Steamship, Co.,* 535 F.2d 761, 777 (3d Cir.1976).

**3.** *J.I. Case Co. v. Borak,* 377 U.S. 426, 431–32, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964); *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 381, 90 S.Ct. 616, 620, 24 L.Ed.2d 593 (1970).

**4.** In early 1955, the Chairman of the Securities and Exchange Commission stated in a public address:

A proxy contest for election to a corporate office is somewhat like a campaign for an election to a political office. A good deal of freedom for candidates in political contests has been traditional in American life. The Commission has always believed that in contests for control of corporate offices there should likewise be freedom to define the issues believed to be involved and that a wide range of debate and argument should be left to the contestants subject, however, to the rule which springs from our statute that investors must not be misled. The Commission's proxy rules thus are designed to assure that basic facts are disclosed, but to leave a wide area for fair comment by the contestants. As I see it, this is the basic philosophy. Armstrong, The SEC and Proxy Contests, 181 Com. & Fin. Chron. 1032, 1052 (1955), *reprinted in* 2 L. Loss, *Securities Regulation* 920 (1961).

**5.** *General Time Corporation v. Talley Industries, Inc.,* 403 F.2d 159, 162 (2d Cir.1968), *cert. denied,* 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969).

**6.** *Plant Industries, Inc. v. Bregman,* 490 F.Supp. 265, 269 (S.D.N.Y.1980); *Kennecott Copper Corp. v. Curtiss–Wright Corp.,* 449 F.Supp. 951, 956 (S.D.N.Y.), *aff'd in part, rev'd in part,* 584 F.2d 1195 (2d Cir.1978).

**7.** *Gould v. American Hawaiian Steamship Co.,* 351 F.Supp. 853, 863 (D.Del.1972); *Gerstle v. Gamble–Skogmo, Inc.,* 478 F.2d 1281, 1299 n. 18 (2d Cir.1973).

To determine whether a corporation acted "knowingly" it is appropriate to consider all of the active agents of the corporation who were involved, not only, for example, the state of mind of the Chairman of the Board, although that is included in the calculation and given appropriate weight.

With regard to negligence, the Court has construed negligence to be the failure to use the care a reasonable person would use under similar circumstances.

With regard to materiality, the Supreme Court in *TSC Industries* stated the classic standard of materiality under Rule 14a–9. A misstatement or omission is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. [This standard] does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." [8]

In general the test is "fair accuracy, not perfection." [9] In assessing "fair accuracy," I have been mindful that the court must consider the hectic pace of a proxy contest. In my view, the need for haste is a particularly relevant factor to be considered in determining negligence, and I suppose, too, deliberate misconduct. [10] Nevertheless, I have also been mindful, as Judge Friendly said in the *General Time* case, that in a proceeding such as this, issuers of proxy statements should be held to fair accuracy even in the "hurly-burly" of election contests. [11]

In reaching the conclusions that I announce and explain today regarding the application of Rule 14a–9 to the facts of this case, I have attempted to employ a realistic understanding of the atmosphere of this fast-paced and competitive proxy contest. As I've mentioned to the parties, I have, as a lawyer in prior incarnations, experienced such events. But I have also tried to bring to bear the recognition of the importance of the courts in reinforcing the high duty of care owed by a corporation to its shareholders. [12] A corollary of this concept is that a corporation must disclose facts to its shareholders as the corporation truly believes them. [13] Deliberate distortions are not permissible.

For the reasons that I will explain in detail in a moment, the Coniston Group's claims that Mr. Gale's telephone calls violated Rule 14a–9 have not been established. Nor has The Coniston Group proven that Gillette violated Rule 14a–9 by failing to disclose certain matters relating to possible buyers. The Coniston Group has, however, persuaded me that, looked at individually and in the context of all communications in the campaign, the April 19, 1988 Gillette ad did violate Rule 14a–9.

My findings of fact and related conclusions of law are as follows. Gillette is an international consumer products firm. Its principal place of business is in Boston.

Keith Gollust, Paul Tierney and Augustus Oliver are partners of Gollust, Tierney and Oliver, also known as GTO, a New Jersey general partnership. GTO is the general partner of several limited partnerships, including Coniston Partners and Coniston Institutional Investors.

Coniston Institutional Investors is a fund with an investment strategy which parallels Coniston Partners. Its members are

8.  *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 2132, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

9.  *Kennecott Copper Corp.,* 584 F.2d at 1200.

10. *Gerstle,* 478 F.2d at 1300 n. 19.

11. *General Time Corp.,* 403 F.2d at 162.

12. *Gerstle,* 478 F.2d at 1300.

13. *Avnet, Inc. v. Scope Industries,* 499 F.Supp. 1121, 1125 (S.D.N.Y.1980).

tax exempt entities like the Common Fund which manages funds for universities such as Harvard, Yale, and MIT. Coniston Partners and Coniston Institutional Investors are limited partnerships established for the purposes of making what GTO calls "strategic block investments."

In the parlance adopted for the purposes of this litigation, in making strategic block investments, GTO identifies companies whose shares are selling below what GTO believes the company as a whole could be sold for. GTO buys a large block of the company's stock. It then seeks to influence management to sell the company at a premium. If successful, this strategy would generate a quick and big profit for GTO and its investors. A proxy contest or election to the Board of the target company is one means of exerting influence in a strategic block investment. GTO successfully pursued strategic block investments in companies including Allegis, Gelco, and Storer Communications.

GTO's interest in Gillette is rooted in events occurring or beginning in November of 1986. In November of 1986, Revlon made a hostile tender offer for Gillette. After unsuccessfully seeking friendly buyers, known as "white knights," for about a week, Gillette agreed to buy Revlon's stock in Gillette at a premium over market value to end the tender offer. In 1987, Revlon made another public effort to buy Gillette. That too was unsuccessful.

In the fall of 1987, GTO identified Gillette as a target for a strategic block investment. It believed, or came to believe, that the company could and should be sold for a premium over its stock market price. GTO, therefore, started buying stock in Gillette.

Beginning on October 19, 1987, GTO discussed its interest in Gillette with Tito Tettamanti. Mr. Tettamanti is a Swiss financier. He is affiliated with GTO in various ventures. Mr. Tettamanti's primary role according to GTO, at least, is to raise money abroad for GTO investments. The precise parameters of his role will probably need to be developed in further phases of this litigation.

In order to obtain the anticipated or desired tax benefits for foreign investors, it was necessary that foreign, or "offshore," limited partnerships be established as vehicles for those investments. In order to qualify for those tax benefits, the partnerships were generally formed in a manner that gave Mr. Tettamanti control of the boards of those corporations or otherwise gave him what would appear to be a sufficiently significant role for tax purposes. As the evidence has evolved in this litigation, it appears that GTO made the investment decisions, as a practical matter, for the foreign entities. After representatives of GTO explained their interest in Gillette to Mr. Tettamanti on October 19, 1987, he agreed to raise money for the investment in Gillette.

The Coniston Group's interest in Gillette led to the establishment of the entity known as the RB Partnership—RB standing for "razor blades," a primary product of Gillette.

In October of 1987, the Coniston name was synonomous with strategic block investing. If it were known that The Coniston Group was buying stock of Gillette, it was likely that the price would go up, and therefore the cost of The Coniston Group acquiring a strategic block would go up proportionally. In order to maintain the confidentiality of The Coniston Group's interest in Gillette, the Group decided to establish a single purpose partnership to buy Gillette stock without using the Coniston name. This partnership was the RB Partnership. There is a significant question as to whether, as a matter of law, that is a limited partnership or a general partnership. It was, however, styled by The Coniston Group as a limited partnership.

The RB Partnership was established under the laws of the Bahamas to get the desired tax benefits for the foreign investors. GTO was a general partner of the RB Partnership and was represented to be the sole general partner. The entities denominated as limited partners were Coniston Partners, which had a 45 percent interest, Coniston Institutional Investors, which had a 12 percent interest; Helston

Investment, Inc., which had a 31 percent interest; Sabre Operations, which had a 5 percent interest, Captain Partners LP, which had a 2 percent interest; Sabre Associates of New Jersey, which had a 4 percent interest; and the Princeton/Newport fund, which had a 1 percent interest.

As I have said, there is a serious question whether the RB Partnership is a limited partnership. This question arises from the fact that Bahamian law requires that a limited partnership be registered; that is, that the names of limited partners as well as the general partners, and the percentage interest which each owns, be placed on file publicly. In addition, certain information regarding such partnerships must be published in the newspaper.

In essence Bahamian law requires the public disclosure of the identification of the limited partners and their interests. Acting on behalf of GTO, however, Mr. Oliver deliberately decided not to register or publish the RB Partnerships in the Bahamas.

Initially the deliberate failure to register or publish the required information regarding the RB Partnership was intended to keep Coniston's interest in Gillette secret. It also, however, had a secondary purpose, apparently; that is to keep the foreign investors in the partnership and the foreign entities investing in the partnership from being disclosed. The evidence suggests that a certain degree of confidentiality was one of the assurances given to prospective foreign investors by Mr. Tettamanti's associate Mr. Lodolo D'Oria. Indeed, The Coniston Group is not aware of the identity of some of the foreign individual investors in entities which are involved in the RB Partnership.

The failure to register as required by Bahamian law was not isolated or accidental. It was habitual. The single purpose partnership established in connection with the Allegis transaction also was not registered.

After the establishment of RB Partners, the second partnership related to this proxy contest in this litigation was established; that is, RB Associates. GTO attracted additional United States investors as potential limited partners for its strategic block investment in Gillette. Limited liability was essential to these potential investors. Mr. Oliver recognized that this assurance of limited liability could not be provided by participation of these U.S. investors in RB Partners because that partnership had not complied with the registration and publication requirements of Bahamian law. Therefore, RB Associates was established as a New Jersey limited partnership providing limited liability for its limited partners. New Jersey law, apparently, does not require public disclosure of the identities of those limited partners.

Tito Tettamanti had an interest in RB Partners and the overall investment in Gillette. He personally had a 2.4 percent interest in the combined RB Partnerships through Helston, Sabre Operations and Captain—Captain being a newly formed entity to provide a vehicle for $5 million which Dr. Tettamanti agreed to raise, and raised, for the investment in Gillette.

In addition, the companies in which Dr. Tettamanti had ownership interest, companies reflected on the chart which emerged in the ad which is Exhibit 1 to this opinion, that is FGNA, NACO, and FIMSA, had a 9 percent interest in the partnerships. In addition, the companies in which Dr. Tettamanti directly or indirectly had a leading role, and these include Helston Investors, Captain, and Sabre Operations, had a 34 percent interest in the combined RB partnerships. Dr. Tettamanti's interest in the RB Partnership was not publicly disclosed until April 11, 1988, in part because the RB Partnership agreement was not registered in the Bahamas.

In January 1988, Gillette heard rumors that The Coniston Group was buying its stock. The company anticipated a possible proxy contest. It then engaged or activated various experts it had engaged to combat hostile efforts relating to the company. These included the Skadden, Arps and Jones, Day law firms. It included the proxy solicitation firm of Georgeson & Company. It included the investment banking firm of Morgan, Stanley and the

public relations firm of Adams and Rinehart.

From the outset Gillette recognized that there are two basic themes in any proxy contest. One of the conventional themes emphasizes the virtues of management and the other conventional theme focuses on the inadequacy of the insurgents.

With a view to developing the second theme, the lawyers for Gillette hired a firm of private investigators, both to investigate GTO and Dr. Tettamanti, who was known to have been involved in prior GTO strategic block investments. Among other things, the private investigators were directed to look for derogatory information regarding GTO and Dr. Tettamanti. The private investigators energetically pursued this task. In their written reports they claimed to have gotten what they call "informal access" to FBI and DEA data. If this is true, it is deplorable as well as perhaps illegal, not necessarily on behalf of the investigators but the government employees involved.

In any event, they did not develop derogatory information regarding GTO or Dr. Tettamanti. Rather, the private investigators reported with regard to GTO some of the following: "Of all those involved in hostile takeover ventures, GTO has the best reputation for integrity and 'above board' dealing.

"Wide spread contacts with members of the financial and banking and investment communities have determined that Messrs. Gollust, Tierney and Oliver are regarded as remarkably brilliant business analysts who are able to perceive investment opportunities and who move aggressively to effectuate them. They are, nevertheless, considered to be essentially honest."

Also, "Contacts with federal and local law enforcement agencies in New York City determined that these contained no derogatory information relative to Messrs. Gollust, Tierney and Oliver with the exception of minor traffic violations.

"Coniston North Atlantic is confidentially reported not to be of record with federal agencies which collect intelligence relating to narcotics traffic and money laundering activities."

The private investigator was similarly unsuccessful in finding derogatory information regarding Dr. Tettamanti. He reported to the lawyers that Dr. Tettamanti "is well known and respected in financial circles and is not associated with any known unethical or illegal practices, although he is an a well-known raider."

He further informed the lawyers, "Swiss business sources categorize Tettamanti as someone with whom they would like to be in business because of his brilliance and for the same reason these individuals would not like to have Tettamanti as a business adversary."

And finally, "Swiss public records contain no derogatory information relative to Dr. Tettamanti or his business ventures."

Thus the private investigators in writing advised Gillette's lawyers that the most fertile area—and this is a quote—"The most fertile area for developing information for Gillette will be in the area of Coniston's offshore corporate structure."

This type of information, however, was hard to obtain because, in part, the RB Partnership was not a matter of public record in the Bahamas. But Gillette did promptly start to develop the information in the chart which emerged on the April 19th ad which is Exhibit 1 to this opinion. Dr. Tettamanti was, at all times, on the top of the chart.

On February 11th, 1988, The Coniston Group filed a Schedule 13D disclosing its holdings and interest in Gillette. That document reports that the RB Partners owned 5.9 percent of Gillette and disclosed that GTO was the general partner. It disclosed that Coniston Partners was one of the limited partners. It did not disclose the other limited partners of RB Partners or RB Associates.

At this point, the primary purpose of not registering RB Partners in the Bahamas had evaporated. Coniston's interest in Gillette was publicly declared by Coniston. In the 13D, the Coniston Partners' name was disclosed because The Coniston Group

wanted to draw on the value of the Coniston name developed in its successful prior strategic block investments.

In the 13D The Coniston Group stated that it felt that Gillette stock was undervalued. The Coniston Group also stated that they might meet with potential purchasers and they might run for election to the Board of Gillette.

On February 19, 1988, The Coniston Group filed an amended 13D announcing its definite intention to run candidates for the Board in the April election.

On March 10, 1988, The Coniston Group sent its proxy statement to Gillette shareholders. In that statement The Coniston Group said that the company could and should be sold for a significant premium over its market price. The Coniston Group's candidates declared that, if elected, they would hire a financial advisor to solicit offers for the company. By this point, the proxy contest was fully and formally launched.

Prior to the annual meeting on April 21, 1988, both sides sent many letters to shareholders. I believe that Gillette has suggested it sent, itself, 22 letters to shareholders. It also published numerous newspaper ads. In addition, both sides made numerous personal phone calls to shareholders. On Gillette's behalf this was done largely by Georgeson and Company and Gillette employees. As I will address later, some calls were also made by Eric Gleacher of Morgan, Stanley. In total, the parties spent about $11 million in connection with the proxy contest, and that does not include the undoubtedly enormous cost of this litigation to date.

In the proxy contest, Gillette consistently emphasized two themes. First, Gillette emphasized that the company should not be sold. Rather, management contended that shareholder value would be maximized by continuation of the pursuit of Gillette's strategic business plan. Gillette's second consistent and persistent theme revolved around the question, "The Coniston Group—Who are they?" The parties agree, and the Court concurs, that is a fair question. It is a legitimate issue in a proxy contest. There is an essential further question, however, and that is whether that issue was dealt with by Gillette in a deliberately false and misleading manner.

Some illustrations of the expression of this theme by Gillette will be noted by the Court. They are examples only. On March 7, 1988, Gillette sent out its proxy statement to shareholders along with a letter and a notice of the annual meeting. In those materials management stated that little is known regarding The Coniston Group. In the proxy statement specific mention was made of Tito Tettamanti, although his role was only one of many issues addressed in that mailing. The proxy statement quotes Dr. Tettamanti as saying that he owned 25 percent of Gillette, and it notes his role in Coniston North Atlantic International Corporation.

Dr. Tettamanti did do several things to draw attention to himself in the course of the proxy contest. In addition to being quoted as saying he owned 25 percent of The Coniston Group, he was also quoted as saying that The Coniston Group owned 15 percent of Gillette rather than the approximately 6 percent disclosed in the 13D. By virtue of a pretext call, however, Gillette found that some of the facts asserted in the quotes were, according to Dr. Tettamanti, not accurate. He may have made misstatements, but Gillette learned that it was not his then current position that those statements were true. In any event, Dr. Tettamanti was not mentioned again in writing until the April 14 letter which Gillette sent to shareholders.

Following up on "The Coniston Group—Who Are They?" theme, Gillette sent another letter to shareholders about a week later on March 15th. It also published that letter as a newspaper ad. It, too, asked "The Coniston Group—Who Are They?", and reiterated that little information was known about The Coniston Group. The evidence indicates that these questions and assertions were also a major theme of the intensive telephone solicitation, and this theme and effort continued throughout the proxy contest.

The Coniston Group made a strategic decision not to respond in detail to the question of who they were. They perceived that they had a limited opportunity to communicate with shareholders and decided they preferred to emphasize their principal issue, that is the sale of the company for a premium. They did issue a letter acknowledging that the question of their identity had been raised and saying, among other things, that one third of their investors, or one third of the investment in their group, was foreign, and describing their success in prior matters such as the Allegis contest.

By April 7, 1988, Gillette had substantially completed the chart which emerged in the April 19th ad. It was not, however, able to link positively certain Tettamanti related entities, such as Helston Investments, to RB Partners. After seeking to engage some political assistance by using the chart in discussions with Massachusetts Congressmen Moakley and Markey, a delegation from Gillette, including its lawyers, visited the SEC.

Representatives of Gillette showed the then existing version of the chart to representatives of the Securities and Exchange Commission. They also furnished the Commission evidence that the RB Partnership had not been registered in the Bahamas. Gillette argued that RB Partners was not a limited partnership and, therefore, there was a legal obligation that all partners, including those denominated as limited partners, be disclosed.

As a result of this visit, the Securities and Exchange Commission contacted GTO and questioned the adequacy of the Schedule 13D. The Securities and Exchange Commission raised the issues that Gillette had raised in the April 7 meeting. GTO responded by filing a fourth amended 13D on April 11, 1988. That document revealed all of the limited partners of the RB Partnership for the first time. It also revealed certain other entities with particular associations with the limited partners for the purpose of the proxy contest. The entities disclosed on the April 11 13D in addition to GTO were Coniston Partners, Coniston Institutional Investors, Helston Investment, Inc., Coniston North Atlantic International Corporation, Sabre Associates of New Jersey, Sabre Management Company, Witherspoon Associates, Sabre Operations Inc., a company known as SNAIC, Princeton/Newport Partnerships, Captain Partners, and SOIM Corporation. Some of these companies were later shown to stockholders in the April 19th ad by Gillette. Many other companies on that ad, however—for example, the Fidinam Group of about five companies on the right side— were not mentioned in the 13D.

The 13D confirmed Gillette's suspicions regarding Helston's participation in the proxy contest, among other things. It also raised what they regarded as a serious question of whether Tito Tettamanti was one of several controlling persons of the RB Partnership. They had certain information from publicly available sources regarding positions he held in companies they could now link with RB Partners. But they did not have certain other information which has emerged during the course of this litigation, like the management agreements which GTO had with those entities.

One week before the election, the election was regarded by Gillette and by the media as too close to call. The Wall Street Journal published this characterization of the contest. In addition, Georgeson & Company estimated that, if, as they expected, about 86 percent of the total shares voted, Gillette would win 43.3 percent to 42.7 percent. This, in effect, confirmed the conclusion that from Gillette's perspective the contest was, immediately before the annual meeting or in the week before the annual meeting, too close to call.

The parties agree and the evidence established that institutional investors are most likely to vote at the end of a proxy contest. There is no dispute about that. Thus, in the last week of the proxy contest, Gillette understood that it was vital to its chances for success to favorably influence those institutional investors.

On April 14th, Gillette filed this lawsuit charging improper failure to disclose entities involved in the proxy contest, among

other things. At the same time, it prepared and presented to the SEC, initially on April 12th, a draft of a letter to shareholders.

The April 14, 1988 letter, which is Exhibit 2 to this opinion, was submitted in draft form to the SEC on April 12th. It is the practice of the SEC to review preliminary proxy materials in order to comment and suggest changes, and in the process promote compliance with Rule 14a–9. Unless accelerated, a company like Gillette may not disseminate preliminary proxy materials until 48 hours after they have been submitted to the SEC.

As Rule 14a–9 paragraph (b) specifically provides, SEC review does not constitute a finding that materials comply with Rule 14a–9 even if all the comments made by the SEC are accommodated. In this case, the review of materials involving the Gillette proxy contest was under the supervision of Richard Baltz, a young lawyer relatively new to his job.

The April 14 letter reiterated the two themes I have identified earlier. First, it emphasized that Gillette believed that shareholder value would be maximized by the continuation of the company as an independent entity rather than by a sale. In addition, the letter asked again, "The Coniston Group—Who Are They?" The letter, as it was provided to the SEC on April 12th, included a version of the chart which emerged in the April 19th ad. This is reflected in Exhibit 29a–1.

The SEC had a number of critical comments concerning the initial April 14 letter. It communicated those comments to counsel for Gillette between April 12th and April 14th. Gillette accommodated some of the SEC's concerns, disagreed with some of the comments or criticisms, and did not make some of the suggested changes. This process is reflected in the series of letters which is included in Plaintiffs' Exhibit 29. It is also amplified by the testimony, during trial, of Mr. Baltz. The SEC's comments and criticisms were addressed initially to Exhibit 29a–1 which evolved into the final letter, Exhibit 2. Of particular relevance to this decision, the

SEC objected to the question, "Who owns and controls the so-called Coniston Group?" It also objected to the question, "What is the role of Swiss financier Tito Tettamanti?" In addition, it objected to a question which was in the early versions of the April 14 letter but did not survive: the question which asked, "Which particular entities in the tangled web of the chart are actually involved in the proxy contest?"

In addition, the SEC objected to the use of the chart with the text of the letter. Some of the reasons for the SEC's objections are reflected in the series of letters which are Exhibit 29. Others were explained by Mr. Baltz in his testimony. As he said it at pages 160 to 162 of the transcript of his testimony, the SEC objected to the question, "Who owns and controls the so-called Coniston Group?", because the question implies a continuing failure, in the SEC's view, to make the disclosures required by Schedule 13D. The staff is very sensitive to suggestions of impropriety of this sort. Their concerns are expressed in Example B to Rule 14a–9. According to Mr. Baltz, the SEC did not feel there was an adequate basis to raise this question on April 14th concerning an improper failure to disclose.

The SEC's comment 14, among others, was addressed to the chart. The SEC expressed the view that the chart was inappropriate because of the answer it suggests concerning control relationships which were not factually supported. As he said at page 161 of his transcript, Mr. Baltz felt that read together the questions and the chart implicitly allege that the individuals and entities on the chart were controlling persons of The Coniston Group.

This concern was amplified later in the context of the preliminary version of the April 19 ad, and the April 20 letter which is Exhibit 29(K). The SEC wrote that it believed "The company has not substantiated its belief that all of the entities on the chart are part of the current Coniston structure." This comment included, but was not limited to, the Fidinam organizations on the right side of the chart.

The SEC in addressing the April 14 letter expressed the view that communications should conform to the disclosures on the April 11, 13D. The 13D reflected some of the new foreign entities on the chart, but not all of them. From the testimony and other evidence, the Court infers that the SEC felt that the use of the chart in the April 14 letter would violate Rule 14a–9.

In addition, the Court notes that the SEC stated the view, in connection with the April 14 letter, that "Rhetorical questions must have a factual basis for implied conclusions." Gillette was on notice of this no later than April 14.

In response to the SEC's comments, Gillette modified some language and deleted some language. Gillette also deleted the chart. It did so, in part, because of the SEC's comments, and also because the letter was considered too long. At this point, Gillette was anxious to publish the letter, and had good reason not to fight concerning SEC clearance of the letter with the chart included.

The company continued to disagree with the SEC on certain points. The company felt it had an adequate basis to ask who really owns and controls The Coniston Group. The company felt it had an adequate basis to ask about the role of Tito Tettamanti. The company also felt, according to Exhibit 29(b), the April 13 letter to the SEC, that it had provided the SEC with adequate "documentary support for its inference that control of the RB Partnership and RB Associates extends up through the chain of investing companies on the chart to Tito Tettamanti." This statement was made when the chart was first submitted. As I said, it is in the April 13 letter. It is part of what the chart was intended to communicate. The company knew this.

The April 14 letter was distributed without accommodating all of the SEC's objections, particularly the objections to "who really owns and controls The Coniston Group?" and "what is the role of Tito Tettamanti?" The company did not satisfy the SEC that it would be permissible to publish the chart in conjunction with these questions. Rather the deletion of the chart

from the letter rendered the issue moot in the mind of the SEC as of April 14th according to Mr. Baltz's testimony on pages 161 and 162.

I have considered whether the April 14 letter standing alone is false or misleading in any material respect. I find that it is not. There is, in my view, an adequate basis to ask if there were any additional controlling people of the RB Partnership.

The law which is reflected, in part, in 17 C.F.R. Section 230.405 indicates that for the purposes of the disclosures required on Schedule 13D, more than one person or one entity may be a controlling person or entity.

I also believe that there was an adequate basis to ask a question regarding the role of Tito Tettamanti in the proxy contest.

Finally, although I do not heavily rely on this, if the SEC's view is deemed correct, these two questions, which they apparently regard as improper, are a relatively small part of an otherwise acceptable, long letter.

In any event, the letter was mailed on Friday, April 15th. The testimony indicates that it would be received starting on about April 18th. It would also be received by some individuals or institutions on April 19th. That is the time when institutional investors particularly were known to be likely to be studying how to vote. That fact, which was known to Gillette, regarding when the letter would be received also indicates to me that the April 19th ad would be read in the context of the April 14 letter.

As I have indicated earlier, and as I will describe in perhaps painful detail, the April 19th ad violates Rule 14a–9, both when read alone within the parameters of its four corners and when read in the context of the whole campaign and the April 14 letter. As I've just said, I consider it fair for Gillette to have asked the questions, "The Coniston Group—Who Are They?"; to ask whether anyone, in addition to GTO, is a controlling person of The Coniston Group; and to ask what the role of Dr. Tettamanti was. But Gillette had a legal responsibility not to provide a false

and misleading answer to these questions. It is in this respect that the ad is fatally flawed.

In the context of the proxy contest, and in the context of the text of the ad, the chart is a graphic response to the questions, which were fair questions. I find that response was deliberately, materially false and misleading. The chart in the ad was deliberately designed to convey to the shareholders that all entities on the chart were involved in the proxy contest; that the chart reflects all of the information Gillette had been able to develop concerning The Coniston Group; that The Coniston Group is a web of primarily foreign entities; and that The Coniston Group is dominated by Tito Tettamanti. This is highly material information. It dramatically changes the "total mix" of information available to shareholders. A reasonable investor would consider it important in deciding how to vote.

Gillette had persistently asked the question "The Coniston Group—Who Are They?" The chart, in the context of the ad, provided the first and only answer. It was not a fairly accurate answer. It was a false and misleading answer. Moreover, it was not an answer provided in good faith. It did not reflect all of the relevant information of which Gillette was aware. These conclusions emerge from a rather detailed analysis of the evidence, which I will describe.

After completing the April 14 letter, the Gillette team began to plan a newspaper ad as its final written communication with shareholders. That team considered various themes. Some were positive themes which would have emphasized management's fine record and the desirability of continuing to pursue Gillette's strategic business plan in order to maximize shareholder value. Various negative themes were also considered. The one adopted in the ad was decided upon. Negative themes are permissible as long as they are not developed and expressed in a false and misleading manner.

On April 18, Gillette submitted the ad in preliminary form to the SEC. Gillette re-quested accelerated treatment so it could publish the ad before 48 hours had expired. This put considerable pressure on the SEC to work quickly. As Mr. Baltz testified at page 166 of the transcript, the SEC never considered the relationship of the ad to the April 14 letter. It had objected to the chart in conjunction with the questions in the letter, but gave no thought at all to the effect of the ad and the letter when considered together, as they would have been by many important shareholders.

The SEC, according to Mr. Baltz, also did not consider the implication of the ad in conjunction with the specific questions: Who controls The Coniston Group? And what is the role of Tito Tettamanti? The SEC did look at whether the entities on the chart had the formal, legal relationships reflected. It did not consider, however, the placement of the entities on the chart or of the individual on the chart, Mr. Tettamanti. It did not consider the size of the boxes. It did not consider the implications of the lines. It did not consider the message that the chart as a whole would convey. The chart is more than a sum of the parts.

The SEC, however, did have comments. In one of its April 20th letters which is Exhibit 29(K), the SEC said that it "continues to believe that the company has not substantiated its belief that the other entities displayed on the chart are part of the current Coniston structure." This refers to the companies not mentioned on the 13D which have a relationship to Dr. Tettamanti. By way of the example only, the SEC, I note, expressed concern about the relationship of the five Fidinam Companies to the RB Partnership. The SEC asked at a minimum, when it appeared that Gillette determined to go with the ad, that the dotted line showing suspected control be eliminated. This was done. It may have somewhat ameliorated the problem raised by the Fidinam Companies, but it did not eliminate them; nor are the Fidinam Companies the only companies raising the problem. But, in any event, the SEC expressed the view to Gillette that the chart included too many entities.

The SEC also commented that the company had not substantiated its belief that the chart shows only part of the Coniston related group. In that comment the SEC was objecting to the suggestion in the first bullet that there were more involved entities still hidden.

The SEC also requested certain changes in the text. The company responded to a certain degree. They deleted the dotted line suggesting upon very careful scrutiny suspected control between the Fidinam line of entities and the RB Partnership. They kept on the many companies not reflected under 13D. They also kept the statement of belief that the chart was only part of the tangled Coniston web.

With this change regarding the chart and some changes in the text, the SEC allowed early publication. The SEC representative, Mr. Baltz, came here only as a fact witness, but would not express an opinion. In candor and in fairness to Gillette, I would say that I infer that the SEC, when they granted accelerated treatment, did not view the ad as materially false and misleading. As I will discuss in detail later, I believe that the SEC made a diligent and professional effort under great pressure, but the scrutiny available in this litigation persuades me that the ad is, among other things, materially false and misleading, and violates Rule 14a–9.

The ad was published in the Wall Street Journal and in the New York Times on April 19th. It was published in other national newspapers the next day. The ad has a particular meaning. It says at the top that it is an open letter to fund managers from Gillette. It is targeted primarily at professional full time investors. These are people likely to study all the materials particularly the April 14 letter and the ad. There are people who are not likely to have voted prior to the publication of the ad, since the parties' experts are in agreement that institutional voters tend to vote at the end of the proxy contest.

Right beneath the statement that this is an open letter to fund managers is the question, "The Coniston Group—who are they?" Right below that is the chart. The

chart seems to present the answer to the question which it follows. The first bullet below the chart makes this more explicit. That is, it makes more explicit the idea that the chart answers the question, "The Coniston Group—Who Are They?" It says that the company believes that the chart shows only a part of the tangled web of Coniston-related foreign and domestic entities.

The chart also seems to answer the questions to which it was originally linked in the April 14th letter: Who really owns and controls The Coniston Group? What is the role of Tito Tettamanti? The chart is accurate with regard to representations that individuals and entities shown have some relationship to each other for some purposes. The chart might be a fair response to the question, "Who is Tito Tettamanti?" Similar diagrams were found by Gillette depicting Dr. Tettamanti's investment structure.

The chart when analyzed microscopically, as it was in the depositions and as it was done at trial, may in many respects be confusing. But when it was read in the context of the proxy contest generally, and with the text of the ad particularly, I am persuaded that the chart conveyed a clear message with several elements. First, the ad indicates that all entities on the chart were involved in the proxy contest or as suggested in the fourth bullet were "behind" The Coniston Group nominees. The SEC specifically objected to the implied assertion that all of these entities were involved in the proxy contest.

In addition, the ad suggests the chart depicts all that Gillette had been able to learn about those involved in The Coniston Group and the proxy contest. Lawrence Fouraker, an outside Director of Gillette, and a former Professor at the Harvard Business School, said that he read the ad this way. He read it as depicting all that Gillette had been able to learn about those involved in The Coniston Group and the proxy contest. He did not think that in constructing the chart management had withheld any information.

The ad indicates, in addition, that The Coniston Group is composed primarily of

foreign entities. Many foreign entities associated with Dr. Tettamanti, but not known to be involved in the proxy contest, are listed on the chart. Foreign entities who are shareholders of certain Tettamanti companies are also included. Major shareholders of such entities, however, like the Irving Trust which is a 39 percent shareholder of Banca della Swizzera Italiana, are not disclosed.

U.S. investors in various Coniston funds directly involved in the proxy contest, however, are not included. For example, the Common Fund, known to be an investor in Coniston Institutional, was not disclosed. Similarly, U.S. investors in Sabre Associates of New Jersey were not disclosed.

The indication that the ad shows that The Coniston Group is composed primarily of foreign entities is reinforced by the fact that the names of foreign countries like Switzerland, the Bahamas, and Panama are listed wherever possible. The location of U.S. companies is not.

Moreover, the size of the boxes suggests an exaggerated foreign role. For example, the Captain Partnership, 2 percent of the investment, is in a much bigger box than the Coniston Partners or Coniston Institutional Investors, which total 57 percent of the investment in Gillette.

The ad also indicates that Tito Tettamanti is the dominant person in The Coniston Group. He's the only individual listed. He is placed at the top of the chart. Organization charts typically have the primary, controlling person at the top. Gillette's organization chart has the dominant entities and individuals at its top.

In addition, next to Dr. Tettamanti's name is the word "control." He is the link for all of the companies on the chart. This suggests that Dr. Tettamanti controls all of the entities on the chart, including GTO and RB Partners and RB Associates which are on the bottom. There's no legend to suggest otherwise or to explain the importance, or intended importance, because there is no actual effective importance of thick lines as opposed to thin lines.

Each of the foregoing suggestions is false and misleading. No evidence has been developed to indicate that many of the Tettamanti related foreign entities are part of The Coniston Group were involved in the proxy contest. One such entity, the DG Bank of Switzerland, actually voted for Gillette. Coincidently, they owned stock.

In addition, the chart did not depict all that Gillette knew about The Coniston Group. For example, Gillette knew that Irving Trust was a major shareholder of the Swiss bank, but did not disclose that American entity. It also knew about many of the U.S. limited partners of certain investors in The Coniston Group, including the Common Fund which managed money for Harvard and Yale, among others.

Moreover, the selection of entities to be placed on the chart improperly exaggerates the role of foreigners in The Coniston Group and the proxy contest. Once again foreign shareholders of Mr. Tettamanti's entities were listed while domestic shareholders like Irving Trust and other U.S. investors in The Coniston Group are not listed.

Finally, the evidence has shown that Dr. Tettamanti is not the dominant person in The Coniston Group for the purposes of the proxy contest. It's fair to ask if he along with GTO is a control person. There can be more than one. Dr. Tettamanti did not dominate The Coniston Group for the purposes of the proxy contest. The companies he was involved with had a 34 percent investment. Coniston Partners and Coniston Institutional had a 57 percent investment. Messrs. Gollust, Tierney and Oliver were principals, not puppets in this proxy contest. Each had a big personal investment in the funds involved in the contest, bigger than Dr. Tettamanti's. It was Gollust, Tierney and Oliver that targeted Gillette. It was Gollust, Tierney and Oliver that developed and executed the strategy of the proxy contest.

The court finds that the false and misleading messages of the ad were deliberate. The ad was not a good-faith effort to convey a message consistent with all of the information that Gillette had.

In addition, and this is not my primary finding, I find that if the deception was not deliberate, it was negligent. A reasonable person in Gillette's position would know the message communicated by the ad, and know that it was a misleading message. This is true, both when the ad is read alone and when the ad is read in conjunction with the April 14 letter.

As juries are often instructed, discerning state of mind requires the use of a degree of common sense, and certain inferences drawn from circumstantial as well as direct evidence. It's particularly true when it's necessary to discern corporate state of mind. I believe it's necessary and appropriate to discern corporate state of mind to look at all of the active agents, including the professional combatants employed by a party, in determining state of mind. It would be inappropriate, in my view, to focus exclusively on the state of mind of any one person, including the Chairman of the Board. The fact the Chairman of the Board may not have personally shared all of the insight and attitudes does not mean that it is not necessary and appropriate to attribute such attitudes to the company.

As I said, there were expert agents as well as regular full-time employees of Gillette who prepared and published the ad, and they were fully authorized to do what they did. They acted for Gillette. Taken together, I'm persuaded, as I said, that the deception in the ad was deliberate.

Gillette had a motive to mislead. As I said earlier, the election was known to be very close. In addition, Gillette believed that The Coniston Group had not competed fairly and might win unfairly. Future phases of this litigation may prove that's true. There may have been some provocation. I infer there was certainly some desperation at Gillette in the final moments of this proxy contest.

From the outset a public investigator had said that the best potential negative theme would involve exploitation of the Coniston Group's offshore foreign structure. Gillette knew, from the inception of the contest, that this was a promising point if it could be vividly made. It decided to try to emphasize this point in the final hour of the proxy contest.

In addition, those focusing on it at Gillette knew that the April 14 letter and the April 19th ad would come to the attention of professionals who cast the votes for institutions at about the same time. They also knew that all of the available information would be considered carefully and together by those professionals also. They knew that the SEC had objected to the use of the chart in conjunction with the questions in the April 14 letter. They knew that the institutional voters would vote late, and likely decide the very close contest. Gillette also knew that the SEC believed that the law requires a reliable factual basis for implied answers to rhetorical questions. The chart did not satisfy this requirement.

Basically, Gillette printed the ad directed at fund managers and asked, "The Coniston Group—Who Are They?" It deliberately exaggerated the foreign characterization of The Coniston Group. Although I'm repeating myself a bit, I would note again that the chart included the Tettamanti foreign entities without evidence that they were involved in The Coniston Group proxy contest. The SEC had objected to this. They deliberately left off U.S. entities with comparable known involvement to the foreign entities shown.

Gillette deliberately and falsely represented all that Gillette could find out and knew about The Coniston Group. The April 19th ad also deliberately conveyed the misimpression that Mr. Tettamanti was the dominant member of the group. Gillette did not believe that Tito Tettamanti controlled or dominated The Coniston Group or the proxy contest. As Mr. Mockler testified in court, as the Chairman of Gillette, he didn't know if Tettamanti controlled the group. He only knew that Mr. Tettamanti was influential; indeed, the single most important person who was not previously disclosed.

Gillette's corporate understanding that Mr. Tettamanti was not the dominant person in the group was reinforced by the *Der Bund* article which is an exhibit in this

case, and by the information obtained by Gillette's pretext call which clarified Tettamanti's statements regarding his role in The Coniston Group and The Coniston Group's investment in Gillette.

Nevertheless, Gillette published the ad knowing it would convey a message that Tito Tettamanti was the primary person in The Coniston Group. As I have said, it is standard for organization charts to have the most important person or entity at the top. Gillette's chart is this way, and the word "control" is next to Dr. Tettamanti's name. As indicated in Gillette's proposed finding of fact No. 33, Gillette knew that Dr. Tettamanti's own organization charts showing his investments were structured this way. There is no evidence to suggest that any of GTO's charts were structured this way or that the Coniston Group's charts were structured this way.

Once again, when the chart was sent to the SEC initially, Gillette's attorney said there was adequate support for the company's inference that control of the RB Partnership extends up through the chain of investing companies to Tito Tettamanti. All of these facts contribute to the conclusion that Gillette acted deliberately.

In addition, I find that a reasonable shareholder would consider the misleading aspects of the April 19th ad important in deciding how to vote. This is why Gillette used it as the final argument in a close contest. Mr. Crane of Georgeson explained this in his deposition.

In addition, there was evidence that shareholders actually considered the ad and the chart to be important. Shareholders communicated this to Gillette's solicitors. Again, this is reflected in Mr. Crane's deposition and also Mr. Zeien's deposition. Shareholders communicated this to The Coniston Group's proxy solicitors too.

It was, as a practical matter, on April 19th too late for The Coniston Group to respond substantively to the ad and the letter. The letter arrived about three days before the meeting. At most the ad was published two days before. There was no time to prepare a response, get it through the SEC, and effectively communicate it to shareholders. It would also have been hard for The Coniston Group to effectively respond to the misleading aspects of the ad even if they had more time to do so.

In the last days of the campaign, The Coniston Group continued to emphasize that the company could and should be sold, hoping to win and survive what it considered a low blow. In addition, on April 19th The Coniston Group filed a counterclaim in this action alleging, among other things, that the April 19th ad was false and misleading.

The April 19th ad may have had a decisive effect on the proxy contest, although it is not necessary for the purposes of this case for The Coniston Group to have shown this.[14] As I have said earlier, prior to April 18th, the contest was regarded "as too close to call" both by the media and by Georgeson. Georgeson estimated that 86 percent of the shares would vote and estimated that 43.3 percent of the shares would be voted for Gillette, and 42.7 percent would be voted for The Coniston Group. After the ad was published, only 75 percent voted.

Georgeson is a well-known, highly expert organization. It is surprising that their estimate of the total vote was so far off. The evidence shows that most of those not voting were institutional investors. It also shows that The Coniston Group did better with institutional investors than Gillette. Gillette did better with individual shareholders.

Between April 19th and 21st, 642,000 proxies for Gillette were received revoking prior proxies submitted for The Coniston Group. 173,000 proxies for The Coniston Group were received revoking prior proxies

---

14. Coniston was not required to show that a material defect "actually had a decisive effect on the voting," *Mills,* 396 U.S. at 385, 90 S.Ct. at 622, since in this case "the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the [election]." *Id. See also Weisberg v. Coastal States,* 609 F.2d 650, 654 (2d Cir.1979); *Plant Industries,* 490 F.Supp. at 269 n. 16.

for Gillette. This represents a net gain for Gillette of about 469,000 votes.

87.4 million of the 115 million shares voted. Gillette won by 3.8 million votes, or 4.3 percent of the total cast. A change of less than 2 million votes, a small number, would have meant victory for the Coniston Group's slate. Similarly, a higher turnout might have given them a victory.

The Coniston Group's remaining contentions can, fortunately, be dealt with more succinctly. The Coniston Group has not proven that the conduct of William Gale violated Rule 14a–9. Mr. Gale is a mid-level employee of Gillette. He's one of many employees who solicited proxies orally. In the process of doing this he called several trustees of the Common Fund in the belief that they would vote shares of Gillette stock held by Coniston Institutional Investors.

The Common Fund also owned some Gillette stock directly, although Mr. Gale may not have known this. In any event, the Common Fund does not vote shares on business matters. On April 18th Mr. Gale called George Keane, the President of the Common Fund. As I said earlier, the Common Fund manages money for colleges and universities such as Harvard and Yale. GTO has done quite well by the Common Fund. Their initial investment of 58 million dollars is now worth 76 million dollars. And while I am confident that Mr. Keane was being honest and candid, I'm sure he appreciated his professional association with The Coniston Group.

Mr. Gale tried to persuade the Common Fund to vote for Gillette. Mr. Keane said that the Common Fund was an investor in Coniston Institutional; it would not vote; and its shares would undoubtedly be voted for The Coniston Group, or he so suggested.

Mr. Keane understood Mr. Gale to say that Tito Tettamanti was an international arms dealer and involved in drug dealing. In his deposition Mr. Gale, who was not called as a witness at trial, testified that what he really said was: Tito Tettamanti could be a very good person or a very bad person. He could be a saint or a sinner like an arms merchant or a drug dealer. If you don't know, how could you be associated with him.

I find that it's not necessary to resolve this conflict. It's possible that Mr. Keane somewhat misunderstood Mr. Gale. It is also possible that Mr. Keane got the right impression even if he didn't remember the words with perfect accuracy. But the Common Fund didn't vote at all, and obviously it relied on Coniston Investors to vote for The Coniston Group.

Contrary to Gillette's contention, Mr. Gale was engaged in proxy solicitation. But any violation of the proxy rules was *de minimis*. To the extent, if any, and it's hardly any, that the Gale evidence has any bearing on the case, it's to suggest the atmosphere and perhaps level of anxiety of Gillette as of April 18th.

The remaining contention relates to the Coniston Group's so-called "no buyers claim." The Coniston Group claims that Gillette campaigned in part on a claim that there were no buyers for Gillette and failed to disclose indications of interest and offers for part of the company which would be inconsistent with such a claim. The Coniston Group, however, has not proven a violation of Rule 14a–9 regarding this contention.

The Coniston Group, itself, campaigned on the contentions that Gillette could be sold for a significant premium above stock market value and that the Board of Directors of Gillette should try to sell the company immediately. In its 13D The Coniston Group said they might meet with prospective purchasers themselves.

There were, however, some points on which the testimony indicated The Coniston Group agreed with Gillette. The Coniston Group, like Gillette, believed that to maximize value the company would have to be sold as a whole, if it is to be sold at all. It would not be appropriate to sell it in parts. Similarly, Mr. Tierney candidly testified that The Coniston Group also believed that a friendly transaction would be necessary to maximize the potential of the company

at any sale; a hostile takeover would not be in the best interests of the shareholders.

As I said earlier, throughout the proxy contest Gillette asserted that the shareholder value would be maximized if the company continued as an independent entity and pursued its strategic plan. The company's written materials emphasized that the company should not be sold. Management did not claim that the company could not be sold, at least in its written materials.

This is exemplified by some of the statements in the April 14 letter which is Exhibit 2 to this opinion. They include the following: "The Board believes that an acquisition premium, even assuming it were obtainable, does not necessarily represent maximum stockholder value."

"The insurgents have made no concrete suggestion as to how they or their nominees would maximize value, and they have identified no particular transaction. The Board believes that all the insurgents have said is that the company should be auctioned off and auctioned off now."

And "The Gillette Board has not said that a sale of the company could never be the best way to maximize value."

As counsel for The Coniston Group, Mr. Zeigler conceded at the June 30, 1988 closing argument if the foregoing exclusively represented Gillette's platform, no further disclosures would be required by the proxy rules. Rather, The Coniston Group contends that Gillette orally altered their theme that the company should not be sold and engaged in a campaign based in part on the assertion that the company could not be sold. Thus, The Coniston Group asserts that Gillette had an obligation to disclose certain matters, including about ten confidentiality agreements with potential purchasers and certain proposals to acquire part of the company. There were no proposals to acquire all of the company.

I find that the oral statements at issue did not alter Gillette's theme that the company should not be sold and did not convert it to a campaign based on the contention that it could not be sold. Nor did the oral statements create any additional disclosure obligations. The oral statements at issue include the following.

Milton Glass, Gillette's Chief Financial Officer, asked some stockholders why The Coniston Group had not named buyers, and arguably suggested that there were no buyers.

Eric Gleacher was Gillette's investment banker at Morgan, Stanley. He made three calls in the final days of the proxy contest: one to Prudential Bache, one to Dean Witter, and one to Security Pacific. Mr. Gleacher and Mr. Wyser–Pratt testified regarding the conversation they had on April 18th. I find that in that conversation, Mr. Gleacher said that the election of The Coniston Group nominees to the Board would be disruptive because they would look for buyers and would be unlikely to find any.

This conversation was followed up by a conversation which Mr. Zeien of Gillette had with Mr. Wyser–Pratt on April 20th. Elaborating on Mr. Gleacher's statements, Mr. Zeien said that Gillette had contacted potential buyers. Some of those buyers, he said, had reviewed confidential information, but none were seriously interested in acquiring the company. He did not tell Mr. Wyser–Pratt when the discussions occurred. In fact, those discussions occurred primarily during one week in November 1986.

I find that the oral statements which The Coniston Group say express the "no buyers" theme are, first, true. From 1986 to 1988 no one offered to buy the whole company. No one solicited in November 1986 was then immediately interested in buying the whole company. And nobody emerged during the two years that Gillette was known to be "in play", as the parties call it, to offer to buy the whole company.

In addition, I find that the oral statements regarding no buyers did not alter the basic Gillette campaign platform. The allusions at issue merely provide a supporting reason why Gillette believed truly that it was preferable to pursue its strategic business plan than to seek to sell the company. The statements regarding "no buy-

ers" also did not alter the "total mix" of information available to shareholders.

In addition, it was fair for Gillette to question why The Coniston Group had not identified any potential buyers. GTO said they might contact some in their initial 13D. Gillette raised this fair question in a measured and appropriate way. The oral statements at issue here made by Gillette were made in good faith, and were based on all the information it had.

In addition, the impact of Mr. Gleacher's statements particularly were, in any event, *de minimis;* Prudential Bache voted for The Coniston Group. As Mr. Wyser–Pratt testified, if The Coniston Group had prevailed and its predictions were prophetic, he would be enriched by $1.5 million. He favored an immediate sale. He was not swayed by Mr. Gleacher. Mr. Gleacher was, indeed, preaching to the committed. Dean Witter, the second institution contacted, did not vote. Security Pacific, the third institution contacted by Mr. Gleacher, split its votes.

In addition, The Coniston Group has claimed specifically that certain confidentiality agreements were material and should have been disclosed. They also contend that a February 1988 offer from the firm of Kohlberg, Kravis and Roberts was material and should have been disclosed. Each of these specific subsidiary contentions is also without merit.

First, with regard to the confidentiality agreements, as I noted earlier, in November 1986, Revlon attempted a hostile takeover or tender offer for Gillette. For one week Gillette, among other things, urgently looked for possible buyers for the whole company. They were looking for the so-called "white knights." Nine companies contacted by Mr. Gleacher expressed sufficient interest in getting confidential information to consider a possible transaction. All of them signed what are in the industry standard agreements restricting their use of confidential information for two years —a relatively short period of time as these things go. Most of those agreements, which are reflected in Exhibit 50, provided that because the companies were receiving confidential information, they would refrain for two years from acquiring or offering to acquire Gillette securities "unless (a) the company has approved such acquisitions or (b) the company has otherwise consented to the disclosure of all confidential information required by law to be disclosed in connection with such acquisition."

I find that this provision would not and did not preclude friendly offers of the sort that The Coniston Group advocates. In fact, several companies who signed such agreements made friendly offers for part of the company. Nobody ever offered to buy all of the company.

I also find that all of the discussions of so-called "friendly transactions" would have been defensive maneuvers. If any of the various transactions discussed in the course of the trial had been consummated by Gillette, it would have resulted in the sale of a significant degree of Gillette equity to somebody friendly to Gillette management. It would have made Gillette harder to take over. It would have entrenched management. Management did not consider the offers, however, to be in the best interests of the shareholders. Thus, they rejected all of the suggestions of various defensive transactions.

The February 1988 KKR proposal falls in this category. During the proxy contest, KKR reiterated the interest in buying preferred stock in Gillette which it had earlier expressed in the summer of 1987. Basically, it was looking to buy 40 percent of the equity in the company. KKR represented that it would favor keeping the company independent. A clear implication of that is that it would vote for Gillette management and against The Coniston Group. If the transaction had been consummated, and KKR had acquired the voting power that they were seeking, their participation would have assured the defeat of The Coniston Group slate. Management rejected the KKR offer because, among other things, it would have amounted to selling control of the company without getting the traditional premium for that control. Once again this reflected commendable restraint. As Mr. Oliver testified, if Gillette had tried

to accept the KKR offer, The Coniston Group would have sued to stop the company as it did in the Allegis and the Storer transactions. I find that KKR was not a buyer for the company, and their letter was not a proposal which Rule 14a–9 requires be disclosed.

That concludes the factual aspects of my findings and my decision concerning the mixed questions of law and fact. There are a couple of legal issues which, however, should be further addressed.

■ With regard to one legal issue relating to the chart in the context of the ad, Gillette has emphasized the accuracy of the information on the chart. They have argued that the chart accurately depicts certain relationships between Mr. Tettamanti and various entities and certain relationships between those entities. They have, therefore, asserted that the chart does not violate Rule 14a–9.

Accuracy, however, does not, as a matter of law, end the inquiry. Something may be literally true but misleading. Common sense suggests this. The law plainly recognizes it. This is the reason that Rule 14a–9 prohibits more than false statements; it also prohibits misleading statements.

Presentation can make accurate information misleading. Mr. Zeigler on behalf of The Coniston Group graphically conveyed that message by using the *New Yorker* cover regarding a Bostonian's view of the world. I will make it Exhibit 4 to this opinion. Somebody should get some pleasure out of this case.

There are cases which recognize that the presentation can make accurate information misleading. I will note only one. That is the case of *Fradkin v. Ernst.*[15] In that case, all of the information regarding the compensation of directors was included in a proxy statement, but it was dispersed. The description of each component of compensation omitted any reference to other components. In that case, the Court found the proxy statement false and misleading because "although that data appears elsewhere in the proxy statement, the discussion of the stock option plan in question does not present the shareholder with sufficient information to locate and collate this other material."[16] Despite the defendant's argument that they had accurately disclosed all the information in the proxy statement and that the nature of the presentation was irrelevant, the Court held that the data was materially misleading. As the Court stated, "Presentation of this important data in this manner renders the proxy statement materially false and misleading despite the fact that all of the data is disclosed."[17]

In addition, the Court in *Fradkin* found that a generalized chart of payable pension benefits was also misleading since it conveyed the impression that the highest pension benefit payable to an individual was less than it would actually be for some of the directors under certain circumstances. As the Court stated, "To the extent that the proxy statement makes disclosures regarding the pension benefits those disclosures are incomplete and presented in a unnecessarily confusing and misleading manner."[18]

These principles are also applicable to the April 19th ad. As described in the Findings of Fact, the ad is deliberately designed to mislead. In addition, accurate information is presented in an unnecessarily confusing and misleading manner. This is true with regard to the relative roles of Mr. Tettamanti, GTO, Coniston Partners and Coniston Institutional. It's also true with regard to the placement of Mr. Tettamanti at the top, and the size and placement of the boxes, and the lines with and without arrows.

In addition, the chart contains irrelevant information relating to many foreign entities unrelated to the proxy contest. They were included to create, and did create, a distorted impression. Similarly, the chart

---

**15.** *Fradkin v. Ernst,* 571 F.Supp. 829 (N.D.Ohio).

**16.** *Id.*

**17.** *Id.*

**18.** *Id.*

omitted information regarding comparable US companies. I will note that I find the ad in this case distinguishable from the events described in the *Samuel M. Feinberg Testamentary Trust v. Carter* case.[19] As I've said, the ad is impermissible.

The corollary of this conclusion is that the chart in the context of the ad is not a mere characterization of The Coniston Group's conduct. I recognize and have applied the proposition that Gillette is entitled to fairly characterize The Coniston Group's conduct. Gillette is not obligated to accept The Coniston Group's characterization of its own conduct. Nor does Gillette have to disclose information favorable to The Coniston Group. The characterization, any characterization, must be made in good faith and be fairly accurate. The claim of conflict of interest in the *Edelman v. Salomon* case,[20] for example, met this standard. For the reasons described in the Findings of Fact, Gillette's use of the chart, in the context of the ad, and in the context of the issues in the proxy contest, did not meet this standard.

■ Finally, with regard to the legal issues, I would like to address the implication of the SEC's actions with regard to the ad. As I noted earlier, the SEC gave accelerated approval to the publication of the ad. For analytical purposes, I have inferred that the SEC did not view the ad as materially false and misleading. Gillette claims that the SEC's view deserves some deference. I will tell you that I have very seriously considered it, in part because I believe it is desirable to encourage compliance with SEC procedures and comments.

Generally speaking, the cases say that courts have refused to accord weight to clearance of proxy materials by the SEC.[21] As I noted at the outset, Rule 14a–9(b) specifically says that, "The fact that a proxy statement, form of proxy or other soliciting materials has been filed with or examined by the Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has approved any statement contained therein. No representation to the contrary shall be made."

The cases also indicate that a limited exception may exist where the precise factual or legal question being considered by the Court has been brought to the attention of the SEC prior to the issuance of the document and the SEC has allowed the form or document to be sent to shareholders without modification.[22]

These principles, however, do not relieve Gillette of liability in this case. As I analyze it, SEC clearance is most relevant if the Court is focusing on the issue of negligence. If Gillette had a good-faith belief in the accuracy and fairness of the ad and got accelerated clearance, I might be persuaded that it was reasonable for it to believe that the ad did not violate Rule 14a–9. But my primary conclusion is that this ad was deliberately deceptive. In those circumstances, while the SEC action, or inaction, has some import, I believe analytically it is of less relevance.

In addition, the SEC did not indicate that the ad was unobjectionable, or did not require modification. The SEC objected to the suggestion that all of the foreign entities were part of the current Coniston structure. The SEC also objected to the suggestion that there were more entities hidden behind The Coniston Group in the proxy contest that were not properly disclosed by The Coniston Group. Gillette did not accommodate those criticisms by the SEC. They are, among others, valid criticisms.

In addition, the SEC did not focus on the chart in the context of the question, "The Coniston Group—Who Are They?" or the questions posed by the April 14 letter. The SEC had objected to the chart in conjunction with the questions in the April 14

**19.** *Samuel M. Feinberg Testamentary Trust v. Carter,* 652 F.Supp. 1066 (S.D.N.Y.1987).

**20.** *Edelman v. Salomon,* 559 F.Supp. 1178 (D.Del.1983).

**21.** *Pabst Brewing Co. v. Jacobs,* 549 F.Supp. 1068, 1076 (D.Del.1982).

**22.** *Id.*

letter: "Who really owns and controls The Coniston Group?" and "What is the role of Tito Tettamanti?"

The SEC apparently did not recognize, as I have found, that the letter and ad would be read together, and that their earlier objections remained valid objections. In addition, the SEC did not at all consider the placement of the boxes, the position in which Mr. Tettamanti was placed, the size of the boxes, the organization of the lines, and the message that cumulatively this would convey. The SEC did not consider the question before this court.

In candor, I will tell you that I struggled with this issue of the SEC clearance. But I got some insight, I think, into its proper place in this analysis late last Friday night. When I went home on Friday night, I carried seven boxes of materials out of my car; I went to a movie with my family; I came home; and I turned on the television. The Red Sox were playing the Royals. They were down by one run. There was a man on base and Rich Gedman was up. He hit a ball to right field that curved toward the foul pole and went out of the park. The umpire called the ball "foul."

The umpire, I'm sure, was honest. He was competent. He had to make an instant decision. It turns out he blew it. The instant replay showed that the ball hit the foul pole, and it was a home run. It also showed that the umpire's error cost the Red Sox the game.

I'm confident that those at the SEC are also honest and professional. They were called upon to make a quick decision under great pressure, and they failed to see some things, in my view, properly. They failed to see the ad in connection with the April 14 letter, and they failed to see the many other material defects that I discerned.

But I don't think that the SEC's error, like the umpire's error, can be allowed to end this analysis. There is a decisive difference between a proxy contest and a ball game. Baseball is a game. The umpire's decision is final, and you go on to play the next game. A proxy contest is not just a game. There are very important shareholder rights at stake. And there might

also be the future of a multi-billion-dollar corporation at stake.

The statute and Rule 14a–9 recognize that the stakes are too great to leave a decision to the instant judgment of the SEC staff. They specifically reserve decision for more deliberate, informed consideration by a Federal District Court, subject to possible appellate review, in the serenity of the Court of Appeals judge's chambers.

I've had an opportunity to become fully informed. I've had an opportunity to deliberate. I have been persuaded that the April 19th advertisement is deliberately and materially false and misleading.

Since I have found that Gillette violated Rule 14a–9, this case is not concluded, as it would have been if I had decided otherwise. As I said at the outset, I must, pursuant to the Agreed Order, I believe, consider Gillette's defense of unclean hands which, in effect, asserts no relief should be granted because of The Coniston Group's alleged misconduct. I must also consider whether Gillette's complaint should be tried before determining what relief, if any, The Coniston Group should get.

As I said in my introduction, the unclean-hands question is not a frivolous question. The Coniston Group deliberately failed to register the RB Partnership in the Bahamas, and to publish the information that Bahamian law requires. Although I'm not yet in a position to decide it, that might mean that all of the participants in the RB Partnership were general partners who, as a matter of law, should have been disclosed on the initial 13D. It may also mean that The Coniston Group violated Rule 14a–9.

As I've also noted, the evidence suggests that there's a meaningful issue of whether Tito Tettamanti was not the dominant person, but one of several controlling persons of the RB Partnership.

I will, as I've said, when the time comes, analyze the unclean-hands issue with care. The fairness of doing what I would try to do, in any event, is reinforced by my understanding that it was the failure of The Coniston Group to register and publish the necessary information in the Bahamas

which created the question which Gillette's ad addresses. It may have to some degree provoked, if not excused, Gillette's misconduct.

I think there are legitimate reasons to tell you that if unclean hands are shown, I think I will be faced with a challenging task of fashioning a remedy. My concern is in protecting the shareholders. My concern is in insuring that important decisions are made on the basis of reliable information. I also have a concern, however, that shareholders not be required to pay for a second multi-million dollars proxy contest and bear the cost of misconduct.

That should not suggest, however, that if unclean hands are established, that there will necessarily be no remedy. This is not a dispute between two private parties where that concept could perhaps be pretty easily invoked. The shareholders' rights are at the core of this dispute. As Judge Friendly, who brought in my view unusual insight to these matters, said that in another case, "Innocent shareholders would find cold comfort in a result that because [management] and [the insurgents] both violated the law, all relief should be denied." [23]

If the defense of unclean hands is established, there are certain things, among others, that you will educate me on that I will consider. I will consider accelerating next year's Gillette annual meeting, and having the contest involve the election of eight directors rather than four. I will consider requiring each side to put up at least $5 million to pay the costs if that side loses the new election, if I order a new election. I will also consider appointing an appropriate monitor. I will have in mind someone along the lines of Archibald Cox or former Federal Judge Harold Tyler of New York, so it will not be necessary to rely exclusively on the SEC.

This sense of direction—that is all it is, because I don't know what questions will need to be answered, and what facts I will have found—may suggest the wisdom of the parties seeking some mutually tolerable resolution of this matter. If the past is prologue, they will not. But the facts have changed by virtue of this decision. This matter has not ended as quickly as Gillette at least would hope. It may be perceived by the parties to be in their interest to reassess their positions in light of this decision and its implications.

**23.** *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 948 n. 7 (2d Cir.1969).

EXHIBIT ONE

THE WALL STREET JOURNAL TUESDAY, APRIL 19, 1988 **47**

# An Open Letter to Fund Managers from Gillette

# THE CONISTON GROUP — WHO ARE THEY?

## How can you vote for the Coniston Group when you don't know who they are?

- Gillette believes that this chart shows only part of a tangled web of Coniston-related foreign and domestic corporations and partnerships which Gillette has asked about from the beginning.

- Until Monday, April 11, only three entities, in addition to their investment advisor, were identified by Coniston as involved with its attack on Gillette (see chart). Only on that date, more than two months after Coniston announced its investment in Gillette, did Coniston in its fourth amended SEC filing begin to disclose some additional facts.

- In order to protect the rights of Gillette stockholders, in light of Coniston's most recent SEC filing, Gillette believed it was necessary to file a lawsuit alleging violations of the disclosure provisions of the Federal securities laws by Coniston. Gillette alleges in the lawsuit that additional information should have been disclosed to stockholders.

- Gillette believes that stockholders voting in this election contest, especially fund managers with fiduciary responsibility, should know who is behind those for whom they are being asked to vote.

Gillette's Board believes that a vote for its nominees is a vote for present and sustainable growth significantly above industry averages, which should lead to continued investment performance significantly above stock market averages. The Board believes that a vote for its nominees is also a vote for the continued commitment to take all steps necessary in the current environment to maximize value for all stockholders.

Colman M. Mockler, Jr.
*Chairman of the Board and*
*Chief Executive Officer*
April 19, 1988

---

## IMPORTANT
### YOU CAN VOTE BY A TOLL-FREE TELEPHONE CALL

To ensure that your Gillette proxy is received prior to the April 21 Annual Meeting, we have established a toll-free telephone procedure by which ALL Gillette stockholders are encouraged to vote their shares.

Your Datagram voting instructions will be received by us, or by your bank or broker if your shares are in Street name, within minutes, and will ensure the representation of your shares at this important meeting.

All Gillette stockholders were mailed instructions on using the TOLL-FREE Datagram voting procedure. Should you have any questions, or need any assistance in making sure your vote FOR the Gillette Board's nominees counts at this critical meeting, please call the Company's proxy solicitor, Georgeson & Company Inc. at 212-440-9800 (call collect) or TOLL-FREE at 1-800-223-2064.

EXHIBIT TWO

**The Gillette Company**
Prudential Tower Building
Boston, Massachusetts 02199

Colman M. Mockler, Jr.
Chairman of the Board

April 14, 1988

Dear Fellow Stockholders:

The Gillette Board believes this proxy contest involves two essential questions:

- Will stockholder value be maximized by continuing the Gillette plan which the Board believes will generate present and sustainable profitable growth significantly above industry and conventional stock market averages . . . or by what the Board believes to be the insurgents' proposal to gain minority Board representation in the hope that this might lead to putting Gillette on the auction block for immediate sale to benefit their backers?

- Are Gillette's stockholders entitled to know who the so-called "Coniston Group" really is and who the real parties in interest in the Coniston Group are, including specifically the relation to Swiss financier Tito Tettamanti?

This letter reviews these questions.

### The Gillette Plan Will Maximize Value for All Stockholders

To summarize Gillette's performance and future prospects:

- Record sales, operating profit, and net income for 1987.
- 1988 expected to be another record year.
- Net income per share increased at approximately a 12% compound annual rate since 1980, assuming 1988 net income of $2.50 to $2.60 per share.
- Expected growth in earnings at a compound annual rate well above 12% for 1989 through 1992, assuming no major changes in exchange, tax, or inflation rates compared with current rates.

As a result, the Board believes that Gillette stock has been an excellent investment:

- Between January 1, 1986 and February 10, 1988, the date Coniston announced its investment position, the market price for Gillette stock more than doubled — creating more than $2.3 billion of stockholder value.
- Gillette split its stock twice and increased its dividend 32% in that two-year period, and is now paying nearly $100 million *per year* in dividends.
- Gillette's total return to stockholders for 1987 was 18.2% — more than three times stock market averages.
- Gillette's 25.3% average compound annual rate of return since 1980 is more than 50% greater than stock market averages.

The Gillette Board will continue to examine all available alternatives for maximizing stockholder value. Unlike the insurgent group, the Gillette Board is not irrevocably committed to any particular means to that end. This is because, again unlike the insurgent group, the Gillette Board has no special constituency, but is committed to taking the steps necessary to maximize value for *all* stockholders.

**The Insurgents' Approach Would Short-Change Gillette Stockholders**

The Gillette Board believes that the insurgents' approach, stripped of accompanying rhetoric, is simply that Gillette should be put on the auction block immediately because it might be sold at a premium to market. The Board believes that this approach should be rejected:

- *The Board believes that an acquisition premium, even assuming it were obtainable, does not necessarily represent maximum stockholder value.* Nor does sale at any particular time. In the Board's opinion, the question is not merely whether a company *could* be sold at a premium to market, but whether value would be *maximized* for all stockholders by a sale at any particular time.

- In the insurgents' own words in their March 10, 1988 solicitation material, "there can be no guarantee that such a sale or merger of the Company can be effected on terms attractive to the stockholders or as to the timing of any transaction." *The insurgents have made no concrete suggestion as to how they or their nominees would maximize value, and they have identified no particular transaction — the Board believes that all the insurgents have said is that the Company should be auctioned off and auctioned off now.*

- *The Gillette Board believes that the division, disruption, and distraction caused by a minority of directors trying to "shop" the Company would endanger Gillette's ability to continue to generate superior results, and might also draw excessive speculation that could force the sale of the Company at less than its maximum value.* The Board believes that such a result could seriously short-change the rest of Gillette's stockholders.

- *The Gillette Board has not said that a sale of the Company could never be the best way to maximize value.* Rather, the Board has consistently said that it will take all steps necessary to maximize value in the current environment and will examine *all* available alternatives. The Gillette Board continues to believe that the way to maximize stockholder value now — especially given Gillette's future prospects — is to continue to generate the strong and sustainable growth in earnings and stockholders' equity which have produced Gillette's superior investment returns.

The Gillette Board believes that a vote for the insurgents is a vote for a special-interest group, the nominees of which have no prior experience in directing the management of a company like Gillette. The insurgents have no concrete suggestions as to how they could maximize stockholder value, and their election might well result in the loss of the very stockholder value they claim to champion.

**The "Coniston Group" — Who Are They?**

From the very beginning of this election contest, the Gillette Board has asked who the so-called "Coniston Group" really is. The Coniston Group joined this issue in its proxy solicitation materials, but tried to sidestep it by making vague references to the general types of investors in some Coniston entities. Coniston said nothing publicly which gave *any* specific information as to which of the web of related entities other than RB Partners, RB Associates and Coniston Partners are really involved here until April 11, 1988, *two months after it announced its investment position and more than a month after distributing its initial proxy material,* when it made a filing with the SEC listing *some* of the real parties in interest in "RB Partners," *one* of the fronting entities set up for the attack on Gillette.

That filing indicates, among other matters, that Swiss financier Tito Tettamanti, who has been reported as owning 25% of "Coniston" is the Chairman of the Board of Coniston North Atlantic International Corp., Sabre·North Atlantic International Corp., and SOIM Corporation, each a Panamanian corporation and key Coniston entity now known to be involved in the attack on Gillette. These entities, of which Mr. Tettamanti is a principal or controlling person, own an aggregate of more than 36% of that "RB" fronting entity.

The SEC filing, which was not furnished to stockholders or publicized by Coniston, in the Board's view discloses nothing about Coniston Partners or RB Associates, the other "RB" fronting entities, the tangled web of partnerships and other entities through which Coniston

conducts its "strategic block" investing activities. or many of the other key questions. including:

- Who really owns and controls the so-called "Coniston Group?"

- What is the specific role of Swiss financier Tito Tettamanti? Why did he say that Coniston controls 15% of Gillette when only 5.9% is reported to the SEC?

- Who owns and controls RB Associates. the other fronting entity formed solely for the attack on Gillette?

- Who furnished the funds for Coniston's Gillette investment and is paying for its proxy contest?

The Gillette Board of Directors has no special constituency. but is committed to·acting to maximize value for *all* stockholders. The Gillette Board continues to believe that the principal objective of the so-called Coniston Group. as applied to Gillette. could put the Group's nominees in positions in which they would have conflicts with their duty to act in the best interests of all Gillette stockholders.

**The Choice Faced by Gillette's Stockholders**

Gillette's Board believes that a vote for its nominees is a vote for present and sustainable growth significantly above industry averages, which should lead to continued investment performance significantly above stock market averages. The Board believes that a vote for its nominees is also a vote for the continued commitment to take all steps necessary in the current environment to maximize value for *all* stockholders. Accordingly, the Board believes that the choice is clear.

The Annual Meeting is scheduled for April 21, 1988 — only a few days away. The Board respectfully requests that. if you have not already done so, you evidence your support by signing, dating, and returning the enclosed BLUE proxy card *today.*

Sincerely,

*Colman M. Mockler, Jr.*

Colman M. Mockler. Jr.
*Chairman of the Board and
Chief Executive Officer*

---

The BLUE proxy card is solicited on behalf of Gillette's Board of Directors.

Your vote is very important. Please sign, date, and return today the enclosed BLUE proxy card in the enclosed postage prepaid envelope.

If you have already returned a BLUE proxy card and have not later signed a white proxy card, no further action by you is required to vote for the Board's nominees.

PLEASE DO NOT RETURN ANY WHITE PROXY CARD. IF YOU HAVE RETURNED A WHITE PROXY CARD, EVEN IF TO WITHHOLD AUTHORITY TO VOTE, PLEASE SIGN. DATE, AND RETURN THE ENCLOSED *BLUE* PROXY CARD IN THE ENCLOSED POSTAGE PREPAID ENVELOPE. THE LATEST DATED PROXY IS THE ONLY ONE THAT COUNTS.

If your shares are held in the name of a broker or nominee, you must provide voting instructions to the broker or nominee for your shares to be represented at the meeting.

For assistance or further information, including information regarding how to vote by mailgram. please call the Company toll free 1-800-551-0100 from outside Massachusetts and 1-800-421-4121 from inside Massachusetts, or call the Company's proxy solicitor, Georgeson & Company, Inc., at 212-440-9800 (call collect) or toll free at 1-800-223-2064.

EXHIBIT THREE

United States District Court

District of Massachusetts

C.A. No. 88–862–WF

The Gillette Company, Plaintiff,

v.

RB Partners, et al., Defendants.

RB Partners and RB Associates,
Counterclaim–Plaintiffs,

v.

The Gillette Company,
Counterclaim-plaintiffs.

AGREED ORDER

June 20, 1988

WOLF, D.J.

This case arises out of a proxy contest conducted in connection with the 1988 annual meeting of The Gillette Company ("Gillette") held on April 21, 1988. The proxy contest involved an effort by the Coniston Group to elect four members of the Board of Directors of Gillette in place of the slate proposed by Gillette management.

On April 14, 1988, Gillette filed a complaint alleging that the Coniston Group [1] had violated the federal securities laws in its solicitation of proxies. On April 19, 1988, the Coniston Group [2] filed a counterclaim, which was amended and supplemented on May 16, 1988, alleging that Gillette had violated the federal securities laws in its solicitation of proxies. The case was assigned to United States District Judge Rya Zobel.

Gillette prevailed by a close margin in the proxy contest. As a result, the parties and Judge Zobel agreed that the non-jury trial of this matter would be bifurcated; the first phase ("Phase 1") would be limited to the issue of Gillette's liability on the Coniston Group's counterclaims; all remaining claims and issues would be moot if the Coniston Group did not prevail in Phase 1; if the Coniston Group prevailed in Phase 1 the court would consider Gillette's defense of unclean hands and determine whether Gillette's complaint should be tried before determining what relief, if any, should be granted the Coniston Group.

The parties informed Judge Zobel that it would take five days to try Phase 1.[3] She scheduled the trial for June 13, 1988. However, in reading the pretrial memoranda, Judge Zobel realized that it would be improper for her to hear this case because she and the Chairman of Gillette serve on the governing boards of Harvard University. On June 11, 1988, Judge Zobel recused herself.

On June 13, 1988, this case was randomly reassigned to United States District Judge Mark L. Wolf. The Coniston Group immediately requested a prompt trial of Phase 1. Upon reading the pretrial memoranda, however, it was evident to the court that it would take considerably longer than five days to try the many issues raised by the Coniston Group's counterclaim.

A hearing was held on June 16, 1988. Gillette then concurred in the request for a

---

**1.** The defendants named in the complaint were RB Partners, RB Associates of New Jersey, L.P., Gollust, Tierney and Oliver, The Coniston Group, Gollust & Tierney, Inc., Coniston Partners, Keith R. Gollust, Augustus K. Oliver, Paul E. Tierney, Jr., David H. Strassler, Michael F. Price, Heine Securities Corp., Tito Pier Domenico Tettamanti, Financial Group of North Atlantic, LTD., Coniston Institutional Investors, Naco–North Atlantic Continental Capital LTD., Coniston North Atlantic International Corp., Helston Investment Inc., Sabre North Atlantic International Corp., Sabre Operations, Inc., Captain Partners, L.P., Soim Corp., Sabre Manage-

ment Co., Sabre Associates of New Jersey, L.P., Witherspoon Associates, Princeton/Newport Partners, L.P., Edward Oakley Thorp, James Sutton Regan, The Corporation Trust Co., and John Does 1 through 40.

**2.** The counterclaim plaintiffs are RB Partners and RB Associates of New Jersey, L.P., Keith R. Gollust, Augustus Oliver, and Paul R. Tierney, Jr.

**3.** Judge Zobel, like this court, conducts trials from 9:00 a.m. to 1:00 p.m. each day.

prompt trial of Phase 1. As explained at the hearing, the court recognized that it would be desirable to decide Phase 1 as soon as possible because the legitimacy of the 1988 Gillette annual meeting and the present composition of its board have been called into question. Thus, the passage of time may involve a measure of irreparable harm if the Coniston Group's claims are meritorious. As the court also explained, however, in view of its other obligations, it would not be feasible for it to commence before at least October, 1988, the lengthy trial of Phase 1 which would be necessary if it included all of the issues and related evidence which the parties proposed to present.[4] The court offered, however, to begin the trial on an expedited basis if the parties would agree to limit the issues and evidence so the necessary testimony could be presented in five trial days and would be supplemented by only a limited amount of additional documentary evidence. The court met on June 16 and 17, 1988 with counsel for the parties and their clients to discuss this proposal and related matters.

As a result of the foregoing discussions, the parties have agreed that an expedited, limited, regulated trial would be adequate to fairly litigate Phase 1 and would be appropriate in order to secure the just and speedy determination of Phase 1. Accordingly, the parties to Phase 1[5] hereby agree, and the court hereby ORDERS, that:

1. The non-jury trial of Phase 1 shall commence on June 20, 1988 and proceed on a schedule to be established by the court.

2. The trial of Phase 1 shall be limited to the two issues identified in the Counterclaim–Plaintiffs' Specification of Issues and Proof dated June 17, 1988. (Exhibit A hereto).[6]

3. The evidence to be presented with regard to Phase 1 shall, subject to the additional limits set forth below, be limited to the evidence identified in Exhibit A and in the Response of the Gillette Company to Outline of Case by Counterclaimants, as supplemented by Gillette's letter dated June 19, 1988. (Exhibit B hereto). This provision shall not, however, preclude any party from offering impeachment evidence.

4. The parties shall each have a total of ten hours for the examination of witnesses, whether called by them or by an adverse party. Questions by the court will be included in the time of the party then examining the witness, unless otherwise ordered.

5. Testimony will be supplemented by the prompt presentation of a reasonable amount of documentary evidence, including deposition transcripts, exhibits, and responses to interrogatories and requests for admissions. The court will be influenced by considerations of complexity, proportionality and time in deciding the appropriate amount of documentary material to accept as evidence.

6. The court will afford the parties a reasonable opportunity to argue the merits of their respective positions.

7. The court will endeavor to decide this matter as soon as possible.

8. When judgment is entered by this court on the issues identified in Exhibit A, the remaining claims included in the Amended and Supplemental Counterclaim dated May 16, 1988 shall be dismissed with

---

4. The court's other obligations include final hearings in July, 1988 concerning the proposed settlement of complex commodity fraud litigation consolidated before this court by the Panel on Multidistrict Litigation, criminal cases with speedy trial considerations, (including a case alleging a conspiracy to ship arms illegally to Iran), and an assignment to sit in Worcester, Massachusetts in September, 1988.

5. It has been previously stipulated that only counterclaim-plaintiffs and Gillette will participate in Phase 1 of this litigation.

6. There are two major issues now to be tried in Phase 1. Generally, these involve (1) Gillette's characterization of the Coniston Group and (2) Gillette's representations regarding the possible sale of the Company. The issues which the Coniston Group has withdrawn in order to secure this Agreed Order relate to but may not be limited to, Gillette's filing of the Complaint in this action, Gillette's statement concerning the repurchase of certain stock, Gillette's earnings projections, and Gillette's by-law amendments.

prejudice and the dismissal of such remaining claims shall not be subject to appeal.

9. At the conclusion of Phase 1, the court, in consultation with the parties, will determine what issues, if any, remain to be resolved.

10. The court may for good cause modify the provisions of this Agreed Order, including but not limited to the time allowed for testimony established in paragraph 4.

11. This Agreed Order will provide a fair and adequate opportunity for the parties to litigate Phase 1 and is desirable as a means of seeking a just and speedy resolution of this litigation.

This Order has been agreed to by the parties on June 20, 1988.

(s) Richard F. Ziegler
Attorneys for Defendant and Counterclaim Plaintiffs RB Partners, RB Associates of New Jersey, L.P., Keith R. Gollust, Agustus M. Oliver, and Paul E. Tierney, Jr.
Richard F. Ziegler
Cleary, Gottlieb, Steen & Hamilton

(s) Patrick F. McCartan
Attorneys for Counterclaim–Defendant the Gillette Company
Jones Day Reavis & Pogue

This order is hereby entered by the court on June 20, 1988

(s) Mark L. Wolf
United States District Judge